THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* CONTINENTAL CASUALTY COMPANY, Defendant.

Supreme Court, Albany County, May, 1935.

*John J. Bennett, Jr., Attorney-General* [*John F. Tucker* of counsel], for the plaintiff.

*McCormick & Eckel* [*Andrew Eckel* of counsel], for the defendant.

STALEY, J. This is an action brought by the People of the State of New York against the Continental Casualty Company to recover the sum of $25,643.90, the increased cost of carrying out a contract, the performance of which had been guaranteed by the defendant.

In August, 1929, Maxwell Brothers, Inc., entered into a contract with the State to build a sanitary sewer for the Wassaic State School at Wassaic, N. Y., for the sum of $179,285. The contract was to be completed on or before the 10th day of June, 1930.

The defendant, as surety, executed a bond to the plaintiff in the sum of $86,643, the condition of which was as follows, to wit: " The condition of this obligation is such that if the said contractor, his, its, their successors, executors, administrators or assigns, or either of them shall faithfully and completely perform said contract, then this obligation to be void, otherwise to remain in full force and effect. The said surety hereby stipulates and agrees that no change, extension, alteration, or revision of the terms of said contract or of the plans and specifications accompanying the same shall in any way effect their, his, or its obligation on this bond."

The contractor entered upon the performance of the contract, and continued to perform work, until February, 1930, when the contract

was abandoned. The State determined to finish the work itself. Thereafter, in May, 1930, the work was readvertised, and a contract to complete it was let to Joseph L. Cuozzo.

Cuozzo bid, to complete the work, the sum of $162,600. Various corrections were made in this bid; no change was made in the unit prices, but some of the extensions were wrong, and one or two items were eliminated as having been completed, including the building of the sewer under the New York Centrail railroad, a matter to be hereafter referred to. After these corrections were made, the amount of the contract was $154,347.50.

The contracts of Maxwell Brothers and of Cuozzo were on the basis of unit prices for estimated quantities.

On the basis of the quantities actually performed, the contract of Maxwell Brothers, Inc., at its unit prices would have amounted to the sum of $186,585.48 if performed by it, instead of the sum of $179,285 on the estimated quantities; and on the same basis the contract of Cuozzo at his unit prices amounted to the sum of $162,575.31 for quantities actually performed, instead of the sum of $154,347.50 on the estimated quantities.

The following provisions were contained in the contract and specifications made by Maxwell Brothers, Inc.:

" 13. It is further mutually agreed that if in the judgment of the Department of Mental Hygiene, the work is not being performed according to the contract or for the best interests of the State, the Department of Mental Hygiene shall have power to suspend or stop the work under this contract while it is in progress and complete the same in such manner as will accord with the contract specifications and be for the best interests of the State; or at the option of the Department of Mental Hygiene that the contract may be cancelled and the work readvertised and relet, and in such cases that any excess in the cost of completing the contract beyond the price for which the work was originally awarded shall be charged to and paid by the Contractor. If at any time in the conduct of the work it shall become apparent to the Superintendent of Public Works that any item in the contract will exceed in quantity his estimate by more than fifteen per centum, he shall so certify to the Department of Mental Hygiene, and the Department of Mental Hygiene shall thereupon determine whether the work in excess thereof shall be completed by the Contractor under the terms and at the prices specified in the contract, or whether it shall be done and furnished by the Department of Mental Hygiene, or whether a special contract shall be made for such excess. If the Department of Mental Hygiene shall determine that such work in excess of the Engineer's

estimate shall be completed by the Contractor, he shall complete the same under the terms and at the prices specified herein.

" 14. It is mutually agreed that the right is reserved to the Department of Mental Hygiene to suspend or cancel this contract, as above provided, and to continue the work in whole or in part, to protect the work accomplished, to salvage the plant and material, to complete the contract or readvertise and relet the same, or combine any two or more of the foregoing items, as the Department of Mental Hygiene may determine, and that the right is reserved to the Department of Mental Hygiene to enter upon and complete any item of the contract which shall exceed in quantity the Engineer's estimate by more than fifteen per centum, or to make a special contract for such excess.

" 15. The Contractor further promises and agrees that all tools, machinery, appliances and materials of every kind which shall be necessary and proper for use upon said work and used or delivered for use upon the same, shall at all times be owned by the Contractor free and clear from all liens or encumbrances of any kind or nature whatsoever, and that if the State by its officers or agents or any of them shall, in the exercise of the rights hereinbefore reserved, assume the execution of the contract or any part thereof or to perform the said work or any part thereof, that the State may take possession of and use for that purpose all of said tools, machinery, appliances and materials or such thereof as may be necessary without let or hindrance by the Contractor or by the Contractor's agents, servants or assistants, and that the State shall have the sole and exclusive right to the possession and use of such tools, machinery, appliances and materials as may be necessary for said purposes, and the value of the use thereof, which shall be determined by the Department of Mental Hygiene, shall be applied upon the cost of completing the contract and credited to the Contractor and the State shall not be liable for any depreciation, loss or damages to said tools, machinery, appliances and materials during said use by the State unless caused by its negligence."

The specifications for this work which are annexed to the contract and form a part thereto provide as follows:

" If the Contractor shall abandon the work under his contract, or fail or refuse to conform with the requirements of the contract, either in workmanship or material, or if at any time the Chief Engineer shall be of the opinion that the Contractor is wilfully violating any of the conditions of the contract, or executing the same in bad faith, or that the Contractor has failed to furnish an adequate plant or to supply a sufficient number of workmen to prosecute the work diligently, or that any part of the work is being unnecessarily

delayed, or if the contract or any part thereof shall be assigned or sublet without the written consent of the Chief Engineer, and the Chief Engineer shall so certify to the Department of Mental Hygiene, the contract may be declared null and void, the security may be forfeited and the materials delivered at or built into the work, and the machinery, implements and tools of every description which may be found at the location of the work, shall become the property of the State. The State through the Chief Engineer, may thereupon call upon the surety to complete the contract as provided for in the bond, or the State, may at its option, proceed to complete the work, either by day work or contract, and any funds retained by the State and any sum realized from the material and equipment reverting to the State shall be applied to pay the increased cost of the work.

" If the contract is annulled under this article, the Contractor shall not be entitled to any damages on account thereof, nor shall such annulment affect the right of the State to recover against the contractor or his surety damages which may arise, or extra costs which may be incurred by it as the result of the failure of the Contractor to carry out the terms of the contract."

Various issues arose in the case, and on the trial a jury was impaneled. But one question was submitted to the jury, namely, " Was the check of Maxwell Brothers, Inc., mailed by the State Comptroller's Office before the lien of the Progressive Clay Company was filed in its office? " The jury answered this question in the affirmative.

The defendant claims that the State failed to make out a cause of action, in that it did not prove the fair value of the extra work performed in completing the contract, and it further claims that various items which the State has included in its cost should be eliminated.

It appears that on December 11, 1929, an estimate was received in the Comptroller's office of moneys due Maxwell Brothers, Inc. This was audited and advanced for payment. According to the system of the Comptroller's office, some time between eleven o'clock and two o'clock, the books were changed over to December 12, and all warrants thereafter drawn were dated December 12. That afternoon, between one and two o'clock, Maxwell Brothers, Inc., asked that they be given a check immediately in order to help them meet their bills. The check was in the Comptroller's office, dated December twelfth, and it was immediately sent out. An hour or so thereafter, a lien was filed against Maxwell Brothers, Inc., by the Progressive Clay Company. As stated above, the jury found that this check had been mailed before the filing of the lien.

The claim of the defendant is that the sending of this postdated check before the filing of the mechanic's lien was not a good pay-

ment to the contractor; that payment of the check should have been stopped.

It is provided in section 31 of the Negotiable Instruments Law that an instrument is not invalid for the reason only that it is post-dated, provided this is not done for an illegal or fraudulent purpose, and that the person to whom an instrument so dated is delivered, acquires title thereto as of the date of delivery.

This being so, upon delivery, Maxwell Brothers, Inc., became the owner of the check; it was a good and valid check, even though postdated.

Also, when the check was deposited in the mail, it was a constructive delivery to Maxwell Brothers, Inc.

Section 2 of the Negotiable Instruments Law provides that "delivery" means transfer of possession, actual or constructive, from one person to another.

When the check was placed in the mail addressed to Maxwell Brothers, Inc., it was a constructive delivery. (*Bainbridge* v. *Hoes*, 163 App. Div. 870.)

It is provided in section 7 of the Lien Law that an advance payment for the purpose of avoiding the provisions of the Lien Law shall be of no effect as against the lien of a subcontractor, laborer or materialman.

As a matter of fact, this was not an advance payment. The work had been performed. It had been certified for payment, and was ready to be paid. The postdating of the check was a mere matter of procedural routine of the Comptroller's office. It was not done fraudulently. The sending of the check was intended as a payment, and must be held to be such, under the circumstances.

This payment amounted to $17,422, and it must be sustained.

The defendant further claims that payment was made to the New York Central Railroad Company in the sum of $1,044.18 for work done by that company in connection with the building of a portion of the sewer under the tracks of the New York Central Railroad Company. Maxwell Brothers, Inc., defaulted in the performance of their contract in February, 1930. On the 6th of May, 1930, an agreement was made between the New York Central and the State, for the construction of the sewer under the railroad tracks. This contract permitted the railroad company to do the actual work under the right of way, if it elected to do so. No complaint can be made as to this particular portion of the agreement between the State and the New York Central, as it was provided in the general contract between the State and Maxwell Brothers, Inc. (specification 2.7), that the methods to be used in passing under or along railroad tracks shall be satisfactory to the

authorities in charge of them. Undoubtedly it is a reasonable regulation on the part of the railroad company to insist upon making changes in its right of way, itself, and not to leave this matter to third parties, which might endanger the traveling public.

After default, however, and when the contract was relet, it was found that this work was completed, and it was eliminated from the Cuozzo contract. The work in carrying the sewer under the tracks was covered by the Maxwell Brothers, Inc., contract. The work was actually performed before the Maxwell Brothers contract was abandoned. Exhibit 18 in evidence shows that the work was done in October, November, December, 1929, and January, 1930. Maxwell Brothers, Inc., paid $2,000 to the railroad company on account of the work, leaving a balance of $1,044.18.

Under the circumstances, since the work of the New York Central Railroad Company was done for Maxwell Brothers, Inc., and was completed before the abandonment of the contract, there was no justification in the making of the agreement of May 6, 1930, between the New York Central and the State, in so far as it provides for work which had already been done. This work had been done in the performance of the Maxwell Brothers contract. It was not done directly for the State and was not done to complete the Maxwell contract. The cost of doing it was a debt of Maxwell Brothers, and its payment by the State was a mere gratuitous payment. This payment must be disallowed as an item of cost in completing the contract or as a charge against the defendant on its bond.

The defendant further objects to certain payments made to lienors, amounting to the sum of $12,902.60. In December, 1930, an action was commenced to foreclose mechanics' liens filed against the Maxwell Brothers, Inc., contract. The defendant in this action was made a defendant in the foreclosure, but the complaint was dismissed as to it, so that the judgment in the foreclosure action is not binding upon this defendant.

The foreclosure action resulted in a judgment, on March 21, 1932. and pursuant to this judgment there was paid out for costs, and to satisfy two mechanics' liens, the sum of $12,902.60.

At that time there was available on the Maxwell Brothers, Inc., contract the following sums: $5,503.64, retained percentages held by the plaintiff under the contract; $7,452 for work which had been performed and certified on January 2, 1930; and $6,494.78 for work which had been done before the default in the contract, and which was certified February 6, 1932.

The claim of the plaintiff is that it was proper for it to pay out, under the foreclosure judgment, the sum of $12,902.60, as there was

due to Maxwell Brothers, Inc., at the time of their default upon the contract, the various sums stated above.

The defendant, on the other hand, states that the State had no right to pay out, or to permit to be paid out, the amount of the judgment in the lien foreclosure action; that the moneys consisting of the retained percentages and the value of work done and certified, and work done and uncertified, were not available to the lienors because of the default of Maxwell Brothers, Inc.; and that under the contract these moneys should have been used by the State to complete the contract, and the State should have applied the same against the cost of completion.

The plaintiff cites and relies on *American Radiator Co.* v. *City of New York* (223 N. Y. 193). The defendant relies upon *Scarsdale National Bank & Trust Co.* v. *United States Fidelity & Guaranty Co.* (264 N. Y. 159).

In the *American Radiator Company* case there was a default under the contract with the city for work in connection with the public schools, and liens were filed. The question was whether or not the liens were good as against amounts certified for payment. The court announced the general rule that if anything is due to the contractor pursuant to the terms of the contract when the lien is filed, it attaches to that extent. In that case, the contract provided for installments as the work progressed. The court stated that the contractor had no right to compensation if he had agreed to forfeit it, but it did not appear that such was the case, and, therefore, the liens attached.

In the *Scarsdale* case, however, the decision turned upon the provisions of the contract. There, the contractor had earned about $10,000 before default, and there was also about $3,000 in retained percentages. The contract in that case provided that if the work was abandoned, the losses and expenses in completing the work, in addition to any other indemnification, might be deducted and paid by the employer out of such moneys as might be due to the contractor under the contract.

Here, the contract provides for payment in installments from time to time, but it appears from the quotations from the contract and specifications given above that the State might complete the work, and any funds *retained* by the State, and any sums realized from material and equipment, etc., should be applied to pay the increased cost of the work.

The contract provided that the Superintendent of Public Works should, between the first and fifteenth days of each month, make and file an estimate of the work done by the contractor and the materials furnished during the preceding month and compute the

value thereof, and that the contractor should be paid within fourteen days thereafter a sum not to exceed ninety per cent of the value of work and materials.

As the contract and specifications stood, therefore, there was due the contractor the amounts earned and certified, until actual abandonment of the contract, unless there was something in the contract to the contrary.

The only provision which gave the State the right to retain moneys earned or certified as due before the abandonment of the contract, and which remained unpaid at the time of the abandonment, was the clause in the specifications giving the State the right to complete the work and to apply and pay the increased cost of the work, if any, from " any funds retained by the State."

" Funds retained by the State " had a definite meaning under the contract. The funds retained were the ten per cent retained percentage provided for in the contract.

No doubt the State might have included a provision in the contract much broader and made available any sums which might be owing to the contractor. All that the State was permitted to withhold to complete the contract pursuant to the terms of the contract were the funds retained, namely, the ten per cent retained percentages.

The question, however, remains as to what extent of the earned moneys the liens filed attached. They attached to the earned moneys as certified on January 2, 1930.

The certification of February 6, 1932, presents a different situation. This certification was for the sum of $6,494.78. It was made two years after the contract had been abandoned and after the contract by its terms had been declared null and void, and after the contract had been completed by another contractor at an excess cost.

The contract of Maxwell Brothers having been breached and nullified, the payment of moneys earned and not certified could not be enforced by the contractor unless they were in excess of the amount due on the contract over the cost of completion. A lienor obtains no greater right to the moneys payable by the owner than the contractor has. (*Bates* v. *Salt Springs National Bank*, 157 N. Y. 322; *Arrow Iron Works, Inc.*, v. *Greene*, 260 id. 330, at p. 342.)

The fundamental principle of the Lien Law is to arrest payments to the contractor, and liens attach only to such payments which the contractor can enforce. The certification of February 6, 1932, which resulted in an increase of the fund from which lienors could satisfy their claims, was not justified and amounted to a payment to lienors for which the defendant should not be charged.

The defense was available to the State, in the lien action, that moneys earned and not certified and payable to the contractor at the time of the abandonment of the Maxwell Brothers contract, and at the time when it was declared voided and breached, could not be reached by lienors. Its failure to assert such defense should not be given the effect of increasing the defendant's liability, and if asserted a payment under the judgment was not binding upon the defendant.

The question as to the availability of such moneys for payment of liens is a defense open to the defendant in this action. (*Conner* v. *Reeves*, 103 N. Y. 527, at p. 532; *Smith* v. *Columbia Casualty Company*, 225 App. Div. 223, at pp. 225 and 226; *Fish* v. *Vanderlip*, 218 N. Y. 29, at p. 37.)

The final claim by the defendant is that the plaintiff did not show the reasonable cost of the work of completing the contract, and also that three items of the Cuozzo contract were not included in the original contract, and were, therefore, extras and should not enter into the cost of completion.

In relation to the first contention, that the plaintiff must prove the reasonable cost of the work of completion, it cannot be sustained. The contract with Maxwell Brothers, Inc., which is binding upon the surety, provided that the State might stop the work and cancel the contract, and readvertise and relet the same, and in such case the excess cost of completing the contract, beyond the price for which the work was originally awarded, must be charged to and paid by the contractor.

The contract itself provides that the excess cost upon the reletting shall be the measure of the contractor's liability for completion. This is likewise the measure of the surety's liability upon its agreement to perform. Therefore, it was sufficient to show the readvertising, the reletting, and the excess cost.

It must have appeared, however, that the excess cost was for completing the work under the former contract.

At the trial, that matter was, as a practical matter, assumed. Moreover, one of the witnesses for the State testified that there were no extras in the Cuozzo contract, and in the letter from the defendant to the State, dated April 18, 1930, complaint is made in relation to two items, and two items only, of the Cuozzo contract.

While the proof might have been more detailed, yet I think sufficient was shown to make out a *prima facie* case that the Cuozzo contract contained no extras, and was confined, with the corrections that were made, solely to completion of the Maxwell contract.

It is true that the Cuozzo bid was reduced, certain items that covered work already performed were eliminated, and there were some errors in carrying out figures. No change was made in unit prices;

there was no fraud or bad faith. The actual cost of completion exceeded the bid, but that is a matter which is not unusual in contracts based upon unit prices. Under the circumstances, the cost of completion must be accepted as the correct amount in determining the liability of the defendant.

In view of the foregoing, the following is a statement of the items allowed and disallowed, and the figures upon which they are based, to wit:

| | |
|---|---:|
| Total paid to Maxwell Brothers, Inc | $35,586 00 |
| Total of Joseph Cuozzo, contract 300 | 162,575 31 |
| Certified before abandonment | 7,452 00 |
| Paid, cost of advertising | 111 29 |
| | $205,724 60 |

From this amount there should be deducted:

| | |
|---|---:|
| The amount of Maxwell Brothers contract | $186,585 48 |
| Refund from New York Central railroad | 69 19 |
| Making a total deduction of | $186,654 67 |

This leaves a balance of $19,069.93 as the excess cost for which defendant is liable.

Findings may be presented awarding judgment to the plaintiff and against the defendant for the sum of $19,069.93, with costs.