290 F.2d 246
 FIRST NATIONAL BANK IN YONKERS, Plaintiff-Appellant,
v.
MARYLAND CASUALTY COMPANY, Defendant-Appellee, City of New
York, William Casey& Sons, Inc., United States of America,
Charles H. Hanson, Charles W. Grant, James Martin, Robert M.
Johnson, As Trustees of the New York City Carpenters'
Welfare & Pension Fund, Defendants, Liberty Mutual Insurance
Company, Defendant-Appellant.
 No. 80, Docket 26028.
 United States Court of Appeals Second Circuit.
 Argued Nov. 14, 1960.
Decided April 27, 1961.
 
 Gerald M. Smith, New York City (Samuel Gottesman, New York City, on the brief), for plaintiff-appellant.
 Emil V. Pilz, New York City (Nevius, Jarvis & Pilz, New York City, on the brief), for defendant-appellee.
 Raymond Gitlin, New York City (Benjamin Rosen, Brooklyn, on the brief), for defendant-appellant.
 Before LUMBARD, Chief Judge, and WATERMAN and MOORE, Circuit Judges.
 LUMBARD, Chief Judge.
 
 
 1
 This case arises out of the breach by William Casey and Sons, Inc., of its contract to construct sewers in Bowery Bay for the City of New York. The City has been satisfied since The Maryland Casualty Company, appellee herein, completed the sewers pursuant to its bond graranteeing Casey's performance. Involved in this appeal are the competing claims of the First National Bank in Yonkers, the Maryland Casualty Company and the Liberty Mutual Insurance Company to $47,133.90, held by the City, and attributable to work done by Casey and approved for payment by the City Engineer before Casey had been formally declared in default.
 
 
 2
 An action to recover $47,133.90 was brought in the Supreme Court of New York County by appellant, the First National Bank in Yonkers, which, prior to Casey's breach, had allegedly received an assignment of all money due or to become due under the contract. Joined as defendants were: the City, Casey, the Casualty Company, four individuals as trustees of the New York City Carpenters' Welfare & Pension Fund, the Liberty Mutual Insurance Company and the United States of America.[1] The case was removed to the district court by the United States acting pursuant to 28 U.S.C. 1444 and 2410.
 
 
 3
 Casey made no answer to the complaint and the trustees, who held an unsatisfied judgment against Casey for welfare and pension contributions, moved to dismiss the complaint. The United States, the Casualty Company and Liberty Mutual filed cross-claims against the City in which they demanded the $47,133.90 or some portion of it. The United States alleged that the money was owing to Casey but that Casey, in turn, was liable to it for $110,390.83 in taxes withheld from wages paid at the construction project. Liberty Mutual, asserting that it was entitled to be paid $39,903.24 owed it by Casey in premiums for workman's compensation insurance at the project, claimed that the Casualty Company had a cause of action for the money but in turn was liable to it upon the surety bond that guaranteed Casey's payment for 'services rendered.' The Casualty Company, which also sought certain other funds in the City's possession,[2] contended that it was entitled to the fund by reason of the $682,637.52 loss it sustained in completing the contract. The City admitted that it held the money but stated that it knew not who was entitled to it.
 
 
 4
 After their answers, the United States and the Casualty Company moved with supporting affidavits for summary judgment. The motion of the Casualty Company was granted and that of the United States denied. From these rulings, the Bank, Liberty Mutual and the United States appealed but thereafter the United States abandoned its appeal and agreed to its dismissal.
 
 I.
 
 5
 The construction contract between Casey and the City and the Casualty Company's surety contract graranteeing Casey's performance were entered into in October of 1955. On February 7, 1956, after working on the project for at least two months, Casey assigned to the Yonkers Bank 'all money * * * due or to become due' under the contract in exchange for '$1 and other valuable considerations.' The Yonkers Bank made continual advances to Casey of which it has not been repaid $50,000, owing since May 10, 1956.
 
 
 6
 Sometime during the middle of May, Casey met with financial difficulties which the Casualty Company attempted to alleviate by advancing funds, allegedly $57,993.91, to cover Casey's payroll and purchase of necessary materials. The Casualty Company's aid, however, was apparently not sufficient because Casey suspended operations at the project sometime before June 4, 1956. Two days later, on June 6, the Commissioner of the City's Department of Public Works demanded that Casey show cause why it should not be held in default. Pursuant to this notice, hearings were held on June 11 and June 13, and on the latter occasion, the Commissioner formally declared Casey to be in default. The district court held, however, that Casey's rights of further payment ceased on June 6, 1956, when he was 'legally' in default and that the City was entitled to retain the $47,133.90, since under no theory had the $47,133.90 become payable to Casey by June 6, and granted summary judgment to the Casualty Company which was subrogated to the City's rights by virtue of having completed the contract at a loss.[3] Scarsdale National Bank & Trust Co. v. United States Fidelity & Guaranty Co., 1934, 264 N.Y. 159, 190 N.E. 330.[4] In so holding the trial court was in error.
 
 
 7
 An analysis of the contractual provisions and the documentary evidence leads us to the conclusion that the sixth progress payment was payable to Casey and, hence, to the Yonkers Bank by assignment before the City acquired any right of retention. We hold that the City had no power to retain funds on account of Casey's default, and that the $47,133.90 had become due to Casey before it received notice of the default declaration. Finally, we hold that if the assignment by Casey to the Yonkers Bank was valid, the City the power, under Article 48 of the construction contract-- which gave the City the power, after the contractor's default, to retain 'such monies as would have been payable to the contractor if he had completed the work * * *'-- or otherwise to withhold from the Yonkers Bank money that was payable to Casey before the default declaration. Since the Bank had advanced $50,000 to Casey which was unpaid, we remand the case with directions to enter judgment for the Bank in the sum of $47,133.90.
 
 II.
 
 8
 We must deal first with the preliminary question of whether Casey's failure to file a statement required by Article 41 of the contract setting forth the wages owing to his laborers freed the City from any obligation to pay the progress payments. We hold that it did not. Though it is conceded that Casey failed to file such a statement, the City never demanded that Casey do so.[5] Therefore, we agree with the Bank that since the City had ample time to demand the statement, its failure to do so constituted a waiver of its right to withhold payment until such a statement was furnished.
 
 III.
 
 9
 We now turn to our conclusion that the sixth progress payment of $47,133.90 had become payable to Casey before it received notice on June 14.
 
 
 10
 Shortly after May 15, 1956, Casey submitted a requisition for work done prior to that date. The City Engineer approved the requisition as required and prepared a voucher for the approval of the Commissioner of Public Works. By May 28, 1956,[6] the Deputy Commissioner of Public Works[7] approved a voucher for $47,133.90. The contract then required the Deputy Commissioner to file the voucher with the Comptroller and provided that 'payment * * * less any and all deductions authorized to be made by the Comptroller * * * will be made by the Comptroller within fifteen (15) days after the filing of such voucher in his office.' The approved voucher was forwarded to the Comptroller's office by the Deputy Commissioner on May 28, 1956, and according to the City the voucher was received and filed on May 29, 1956.[8]
 
 
 11
 Therefore, the City was under an obligation to make the payment approved by the voucher 'less any and all deductions authorized to be made by the Comptroller' within fifteen days from May 29, the date the City claims the voucher was filed. This period expired at the end of the fourteenth day, June 12.
 
 
 12
 But Casey was not in default until it received on June 14 the Comptroller's written notice of his June 13 declaration of default.
 
 
 13
 Significant is the City's use of the word 'declare' in Articles 45 and 48 of the contract. Article 45 covers the 'Commissioner's Right to Declare Contractor in Default.' After listing various grounds for default, a procedure is specified whereby before exercising 'his right to declare the Contractor in default' he shall give the Contractor an opportunity to be heard on two days' notice. Under Article 48 'after declaring the Contractor in default,' the Commissioner was entitled to have the work completed by other means and then charge the expense of such completion against 'monies as would have been payable to the Contractor if he had completed the work.' Default thus was not to be objectively determined by an act or failure to act but only by a declaration by the Commission after a hearing.
 
 
 14
 Accepting the dictionary and common meaning of 'declare' as 'To meke known explicitly, esp. by language; to communicate clearly to others, whether by acts, words, writing or signs; to publish; announce;' (Webster, New International Dictionary, 2nd Ed. unab.), the method chosen by the City to make its decision known was by letter to Casey. The letter dated June 13 itself states that the explainations offered by Casey in the hearings of June 11 and 13 were not acceptable and that 'Under the circumstances, therefore, you are hereby notified that you are declared in default * * *' The letter further stated 'Upon receipt of this notice you shall immediately discontinue all further operations under this contract and shall immediately quit the site leaving untouched all plant materials, equipment, tools, and supplies now on the site.' The plain meaning of these words is that notice to Casey is intended and that such notice is to be given 'hereby,' i.e. by the letter; 'notice' and 'notify' by root derivation and accepted usage contemplate knowledge which could be obtained only by receipt of the June 13 letter. Thus, the City in practice showed that a state of default was to be declared by a notice which the City chose to give in written form.
 
 
 15
 As we have said, the payment voucher dated May 28 was filed on May 29. Although the record does not discolse when the June 13 letter was received by Casey, the letter must have been written and mailed after the hearing on June 13. Assuming a mail transit period of a day, notice of default would not have been received until June 14.
 
 IV.
 
 16
 We now turn to consider whether the City had any right under Article 48 of the contract or otherwise to retain money that had become due and payable before default. We conclude that it did not.
 
 
 17
 Article 48 gave the City the power to retain 'such monies as would have been payable to the Contractor if he had completed the work.' We do not think this covered the sixth progress payment. The language '(money that) would have been payable' does not include money that had already become payable, as had the sixth progress payment.
 
 
 18
 There are two other funds to which Article 48 would apply for the protection of the City after Casey's default: first, $60,434.60 which represented 5% Of what had been earned by Casey prior to its default and which the City was permitted to retain from progress payments until satisfactory completion of the contract, and second, the City could retain $9,715.24, which had been earned by Casey prior to default but which had not become payable under Article 41's procedure as outlined above.
 
 
 19
 The cases upon which the Casualty Company relies to support its claim that the contract gave the City power to retain the sixth progress payment are all distinguishable. In each case, the contract involved explicitly gave the party in the position of the City the right to retain all money in its possession including money that was due and payable to the party in Casey's position. See Scarsdale National Bank & Trust Co. v. United States Fidelity & Guaranty Co., 1934, 264 N.Y. 159, 162, 190 N.E. 330, 331 ("such moneys as may be due or may at any time thereafter grow due * * *"); United States Fidelity & Guaranty Co. v. Triborough Bridge Authority, 1947, 297 N.Y. 31, 34, 74 N.E.2d 226 ('The contract * * * provided * * * (that the) Authority should have the right to withhold * * * any payments due the contractor * * *');[9] Aetna Casualty & Surety Co. v. United States, 1958, 4 N.Y.2d 639, 643, 176 N.Y.S.2d 961, 963, 152 N.E.2d 225 ('Partial payments could be withheld * * * if (the party in the City's position) felt that work was not progressing satisfactorily'). Cf. Slattery v. National Commercial Bank & Trust Co., Third Dept., 1931, 247 App.Div. 221, 286 N.Y.S. 337.
 
 
 20
 Indeed, the fact that this contract did not specifically give the City power to withhold funds that had become payable when other contracts, one involving the City of New York,[10] have explicitly provided for such power, is further support for our conclusion. People v. Continental Casualty Co., Sup.Ct., Albany County, 1935, 157 Misc. 15, 22-23, 282 N.Y.S. 202; cf. American Radiator Co. v. City of New York, 1918, 223 N.Y. 193, 119 N.E. 391.
 
 V.
 
 21
 Although the Yonkers Bank did not move for summary judgment, this court may direct the district court to enter summary judgment if all the issues were before the district court and no material issue of fact is disputed. See 6 Moore Federal Practice, para. 5612; compare Fountain v. Filson, 1949, 336 U.S. 681, 69 S.Ct. 754, 93 L.Ed. 971. On the record we find no material issues of fact.
 
 VI.
 
 22
 Finally, we must briefly consider Liberty Mutual's appeal. We think that Liberty Mutual's cross-claim, based upon Casey's alleged failure to pay insurance premiums, should not prevail in this action irrespective of whether the Yonkers Bank or the Casualty Company has a right to the fund. Liberty Mutual did not file a lien until after the payment had become payable to Casey. Therefore, its claim is inferior to the Yonkers Bank which was entitled to the fund as soon as it became payable to Casey.
 
 
 23
 We reverse the award of summary judgment and remand the case with directions to enter judgment for the Bank in the sum of $47,133.90.
 
 
 
 [1]
 The parties will be referred to throughout as the Yonkers Bank, or occasionally the Bank, the City, Casey, the Casualty Company, the trustees, Liberty Mutual and the United States
 
 
 [2]
 These other funds are not before us. Judge Cashin dismissed the Casualty Company's claim for them as premature and no appeal was taken from that portion of Judge Cashin's order
 
 
 [3]
 The Casualty Company is also subrograted to Casey's rights. If the money at issue was due to Casey despite his default, and if Casey was liable to the Yonkers Bank on the assignment, however, this is of no value to the Casualty Company since all money due to Casey was payable to the Yonkers Bank
 
 
 [4]
 New York law is determinative of the issue. The sewers were to be built in New York and payment was to be made from the office of the Comptroller of the City of New York
 The question of the applicable law in a case of this sort when the United States Government is claiming a tax lien is not before us. Compare Fidelity & Deposit Co. of Maryland v. New York City Housing Authority, 2 Cir., 1957, 241 F.2d 142, 145.
 
 
 [5]
 The City's answer and its Chief Auditor's description of the Comptroller's records state that payment was withheld because Casey defaulted. Their failure to add that the money was withheld because Casey had not complied with 220-a of the New York Labor Law, McKinney's Consol.Laws, c. 31, referred to in Article 41, can indicate only that the City had not insisted that it do so
 The Casualty Company's answer, which relied heavily upon Casey's failure to file the wage information, was filed on September 26, 1958, long before the City filed its exhibit, dated December 24, 1958 or its answer, dated January 6, 1959. Therefore, the Casualty Company cannot contend that the City would not have thought of mentioning the ground for retention of money that is here discussed.
 
 
 [6]
 The Yonkers Bank claimed that the voucher was approved on May 23, 1956. An affidavit for the City is ambiguous but seems to say that May 28, 1956 is the correct date. The difference is not material to the issues in this case
 
 
 [7]
 The fact that action was taken by the Deputy Commissioner rather than the Commissioner we do not believe to be of significance. Cf. Jay v. Boyd, 1956, 351 U.S. 345, 76 S.Ct. 919, 100 L.Ed. 1242; Kimm v. Rosenberg, 1960, 363 U.S. 405, 408, 80 S.Ct. 1139, 4 L.Ed.2d 1299
 
 
 [8]
 We credit the City's specific allegations on this point, rather than the unsupported assertions of the Bank that the voucher was received by the Comptroller on May 28. Cf. De Luca v. Atlantic Refining Co., 2 Cir., 1949, 176 F.2d 421, 423, certiorari denied 338 U.S. 943, 70 S.Ct. 423, 94 L.Ed. 581
 
 
 [9]
 The language quoted in Judge Fuld's paraphrase of the contract, the precise language of which is not set forth in his opinion or in the opinions below. See Sup.Ct., N.Y.County, 48 N.Y.S.2d 16; First Dept., 269 App.Div. 978, 59 N.Y.S.2d 291
 
 
 [10]
 One of the parties to the contract in Aetna Casualty, supra, was the New York City Housing Authority