AU YI LAU et al., Petitioners,

v.

UNITED STATES IMMIGRATION AND
NATURALIZATION SERVICE,
Respondent.

No. 76–1048.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 17, 1977.

Decided April 28, 1977.

David Carliner, Washington, D. C., for petitioners.

Richard I. Chaifetz, Atty., Dept. of Justice, Washington, D. C., for respondent.

Before McGOWAN, ROBINSON and WILKEY, Circuit Judges.

Opinion for the Court filed by Circuit Judge McGOWAN.

McGOWAN, Circuit Judge:

Petitioners are three Chinese crewmen who deserted their ships in American ports and have been residing as unauthorized aliens in this country since 1967. Following evidentiary hearings in 1968, deportation orders were issued against petitioners by a Special Inquiry Officer of the Immigration and Naturalization Service (INS), and affirmed by the Board of Immigration Appeals. Over six years ago, these deportation orders were upheld by this court. *Au Yi Lau v. United States Immigration and Naturalization Service*, 144 U.S.App.D.C. 147, 445 F.2d 217 *(Au Yi Lau I)*, cert. denied, 404 U.S. 864, 92 S.Ct. 64, 30 L.Ed.2d 108 (1971).

On November 1, 1971, after this court's decision and the Supreme Court's denial of certiorari, petitioners moved the Board of Immigration Appeals to reopen their deportation proceedings to enable them to apply for permission to depart voluntarily from the United States in lieu of being deported. *See* 8 U.S.C. § 1254(e) (1970). Although application for voluntary departure had not previously been made, petitioners alleged that at the time of the prior deportation proceedings it was not clear that they could apply for voluntary departure while simultaneously challenging their deportability. In addition, petitioners asserted that circumstances had changed since entry of the deportation orders, inasmuch as INS had granted each of them "sixth preference" status, under 8 U.S.C. § 1153(a)(6), in the applicant pool for immigration visas.

Oral argument was heard by the Board on February 3, 1972. On July 21, 1975, over three years and five months later, the Board denied the motions to reopen. Petitioners challenge this decision on two grounds: first, that the Board was not properly constituted during the decision-making process; and second, that the Board's action contravened the regulations governing reopening of proceedings and deprived petitioners of a fair opportunity to apply for voluntary departure. For the reasons set forth hereinafter, we find these arguments unpersuasive, and affirm the decision of the Board.

I

Section 244(e) of the Immigration and Nationality Act, 8 U.S.C. § 1254(e) (1970), provides that

The Attorney General may, in his discretion, permit any alien under deportation proceedings, [with exceptions not relevant here], to depart voluntarily from the United States at his own expense in lieu of deportation if such alien shall establish to the satisfaction of the Attorney General that he is, and has been, a person of good moral character for at least five years immediately preceding his application for voluntary departure under this subsection.

Special Inquiry Officers of the INS have been delegated power to authorize voluntary departure,[1] in their discretion, in cases in which the alien satisfies the "moral character" requirement of section 244(e) and "establishes that he is willing and has the

1. From the alien's standpoint, voluntary departure is preferable to deportation since, *inter alia*, it avoids the stigma of deportation, allows the alien to choose his destination, and eliminates the need to receive special permission from the Attorney General in order to re-enter the United States. *See* 8 U.S.C. § 1182(a)(17) (1970); *Tzantarmas v. United States*, 402 F.2d 163, 165 n.1 (9th Cir. 1968), *cert. denied*, 394 U.S. 966, 89 S.Ct. 1312, 22 L.Ed.2d 569 (1969).

immediate means with which to depart promptly from the United States."[2]

INS regulations have at all relevant times provided that applications for voluntary departure "shall be made only during the [deportation] hearing and shall not be held to constitute a concession of alienage or deportability in any case in which the respondent does not admit his alienage or deportability." 8 C.F.R. § 242.17(d). Both the Special Inquiry Officer and the Board of Immigration Appeals have the authority to reopen the deportation hearing for the purpose of providing an opportunity to apply for voluntary departure. But the governing regulations make clear that proceedings may not be reopened for that purpose if (1) the right to apply for voluntary departure was fully explained to the prospective deportee and (2) an opportunity to make application for such relief was afforded at the original hearing, unless (3) the relief is sought on the basis of circumstances which have arisen subsequent to that hearing.[3]

In the case at bar, petitioners did not apply for voluntary departure at the deportation hearings before the Special Inquiry Officer. Upon the advice of counsel, they stood mute and presented no evidence.[4]

Petitioners' written motions to reopen proceedings did not contain any allegations that their rights to apply for voluntary departure had not been fully explained to them. The motions stated that counsel had advised petitioners to remain silent at the deportation hearings on the grounds that a substantial issue was presented regarding the legality of their arrests, see note 4 supra, and that "it [had] not . . . been clearly established at the time of the proceedings that [petitioners] could simultaneously apply for voluntary departure while challenging [their] deportability." As to circumstances arising subsequent to the hearings, the submissions noted only that the deportation orders had been upheld upon judicial review, and that petitioners had each qualified to be considered for immigrant visas under the "sixth preference" portion of the immigration quota.[5]

---

2.  8 C.F.R. § 244.1 (1976); see id. § 242.17(b).
    As the prior proceedings in this case illustrate, Special Inquiry Officers have been delegated plenary authority to rule on questions of deportability and to enter orders of deportation, subject to review by the Board of Immigration Appeals. See id. Part 242; id. § 3.1(b)(2).

3.  8 C.F.R. § 3.2, which covers reopening of cases by the Board, provides in relevant part:
    . . . nor shall any motion to reopen for the purpose of affording the alien an opportunity to apply for any form of discretionary relief be granted if it appears that the alien's right to apply for such relief was fully explained to him and an opportunity to apply therefor was afforded him at the former hearing unless the relief is sought on the basis of circumstances which have arisen subsequent to the hearing.
    The regulation which controls reopening of proceedings by the Special Inquiry Officer has a similar proviso:
    . . . nor will any motion to reopen for the purpose of providing the respondent with an opportunity to make an application [for voluntary departure] be granted if respondent's right to make such application was fully explained to him by the special inquiry officer and he was afforded an opportunity to do so at the hearing, unless circumstances have arisen thereafter on the basis of which the request is being made.

Id. § 242.22.
    There is some ambiguity, at least in the regulation governing the Board, as to whether a full explanation to the prospective deportee by his counsel is a valid substitute for a direct explanation of voluntary departure rights by the Special Inquiry Officer. Petitioners in the instant case maintain that the Special Inquiry Officer did not address them directly on this matter but, as we explain below, see Part III infra, the issue is not properly before us since it was not presented to the Board.

4.  In appealing the deportation order to the Board and then to this court, petitioners did not dispute the sufficiency of the evidence adduced at the hearings. Rather, they claimed that the evidence was the fruit of an illegal arrest and should therefore have been excluded. Upon review of the facts, we concluded that petitioners' arrests were in full compliance with the requirements of the Fourth Amendment. Au Yi Lau I, supra.

5.  Applicants for immigrant visas who have established that they fall within one of the categories enumerated in 8 U.S.C. § 1153(a) are entitled to preferential consideration in the allocation of places within the immigration quota. The categories are ranked in order of priority, with top priority consideration given to members of the "first preference" category,

Oral argument was heard by the Chairman of the Board of Immigration Appeals at that time, Maurice Roberts, and Board Members Marianne R. McConnaughy and Louis Maniatis.[6] The case was argued for the INS by Irving A. Appleman, then an appellate trial attorney under the supervision of the General Counsel of INS; petitioners were represented by their current counsel.

Petitioners' counsel expressly indicated that no claim was being made that petitioners had not received a full and timely explanation of their right to apply for voluntary departure.[7] Instead, counsel elaborated on the argument in the written motions to the effect that petitioners' ability to apply for voluntary departure while challenging deportability was not clear. He represented that his clients did not file for voluntary departure at the earlier hearings out of fear that their testimony on that matter might be used against them on the question of deportability. While 8 C.F.R. § 242.17(d) clearly bars the use of an *application* for voluntary departure as evidence of deportability, counsel argued that the regulation is ambiguous with respect to the use of supporting testimony. *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), was cited for the proposition that petitioners could not be compelled to surrender their fifth amendment privilege against self-incrimination, as they allegedly would have been forced to do by testifying in these circumstances, in order to obtain the statutory benefit of voluntary departure.

In the inordinately lengthy period of time between oral argument and decision of the case, Mr. Roberts and Ms. McConnaughy retired from the Board. David Milhollan, who had been an attorney in the office of the INS General Counsel at the time of argument, was appointed to the Board and replaced Mr. Roberts as Board Chairman on February 3, 1975; Irving A. Appleman, who had argued the case for INS before the Board, replaced Ms. McConnaughy. Thus, of the three members who heard oral argument, only one—Mr. Maniatis—was still on the Board when the case was finally decided.

Mr. Appleman abstained from consideration of the case, but Chairman Milhollan, Mr. Maniatis, two other Board members, and one alternate member participated in

---

second priority to members of the "second preference" category, and so forth. *See id.* § 1153(b) (1970). Within each preference category, visas are issued in the order of the applicants' "dates of priority," *i. e.*, the dates on which their petitions for approval of such preference status were filed with the INS. *See id.* §§ 1153(c), 1154. Thus, INS approval of preference status, even "first preference" status, does not guarantee immediate receipt of an immigrant visa; rather, in addition to meeting other requirements for admission, *see id.* § 1182(a), the applicant must wait his turn.

The "sixth preference" category encompasses "qualified immigrants who are capable of performing specified skilled or unskilled labor, not of a temporary or seasonal nature, for which a shortage of employable and willing persons exists in the United States." *Id.* § 1153(a)(6). Petitioners alleged that they had each received approval from the INS for "sixth preference" status, with dates of priority of September 20, 1971, on the basis of alien employment certifications which they had previously obtained.

6. 8 C.F.R. § 3.1(a) has provided at all relevant times that "[t]he Board shall consist of a Chairman and four other members . . . ."

7. Counsel remarked:

> I don't take issue with the fact the special inquiry officer did not explain anything to the alien . . . . The special inquiry officer typically asks the attorney, does your client understand the nature of the proceedings . . . and every attorney who has any experience says *yes*, he accepts [the] responsibility of explaining to his client what the nature of the proceedings are [*sic*], and what discretionary relief is. . . . that is not the position I am taking here, that my client didn't know what was happening. I accept responsibility for explaining it to him. I will not try to argue my clients didn't know.

J.A. 29 (emphasis in original). Thus, petitioners did not present to the Board the issue of whether the Board's regulations setting forth the conditions under which proceedings may not be reopened contemplate a direct explanation to the alien from the special inquiry officer, rather than from counsel. *See* note 3 *supra*.

the Board's decision of July 21, 1975.[8] Chairman Milhollan's opinion for the Board, J.A. 2–4, noted first that "[i]t is not contended that [petitioners'] right to apply for voluntary departure was not fully explained to [them] at their hearings." The opinion went on to hold that petitioners "had no valid reason for their failure to make applications for the privilege of voluntary departure" inasmuch as the evidence which would be required to demonstrate eligibility for voluntary departure is wholly unrelated to the issue of deportability. The holding of *Simmons, see* 390 U.S. at 394, 88 S.Ct. 967—that when a criminal defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted over his objection at trial on the merits, since a contrary rule would require him in effect to waive his fifth amendment privilege against self-incrimination in order to assert his fourth amendment rights—was distinguished on the ground that in their deportation proceedings petitioners would in no sense have been compelled to surrender one constitutional right in order to assert another. Finally, the opinion concluded that "[t]here are no circumstances which have arisen which warrant a reopening of the proceedings." [9]

On January 16, 1976, five days before the expiration of the statutory period for seeking judicial review, petitioners filed this challenge to the Board's order denying their motions to reopen proceedings. We have jurisdiction under 8 U.S.C. § 1105a. *See Giova v. Rosenberg,* 379 U.S. 18, 85 S.Ct. 156, 13 L.Ed.2d 90 (1964), *rev'g* 308 F.2d 347 (9th Cir. 1962).

## II

■ Petitioners contend that the Board was unlawfully constituted in three respects. First, the fact that only three members of the Board heard oral argument, it is asserted, violated a regulation promulgated by the Attorney General stating that the Board "shall consist of a Chairman and four other members . . . ." 8 C.F.R. § 3.1(a). We think it clear, however, that the common law rule—under which a simple majority constitutes a quorum of a collective body in the absence of a specific limitation to the contrary—provided ample authority for conducting hearings before three members of a five-person Board. *See FTC v. Flotill Products, Inc.,* 389 U.S. 179, 181–84, 88 S.Ct. 401, 19 L.Ed.2d 398 (1967); *Ho Chung Tsao v. INS,* 538 F.2d 667 (5th Cir. 1976). Far from restricting the operation of the simple majority rule, 8 C.F.R.

---

**8.** The record does not specifically show Mr. Maniatis as joining any of the opinions in the case, but all parties before us seem to assume that he did participate in the decision. Since none of petitioners' claims turn on this question, we have made the same assumption.

**9.** Board Member Torrington wrote an opinion concurring in the majority opinion and adding a few comments amplifying on the majority's reasoning. With respect to petitioners' argument that changed circumstances justified reopening of the proceedings, he explained:

There are no relevant circumstances which have arisen subsequent to the hearing, and which could justify a reopening of the proceedings. The fact that these crewmen have, for so long, stayed in this country illegally, appear to have worked here illegally, and have managed to become beneficiaries of sixth-preference petitions, is not a ground for reopening of the proceedings to give the respondents an opportunity to apply for voluntary departure.

J.A. 8.

In another concurring opinion, Alternate Board Member Jakaboski observed that "[t]he opinion of the majority is correct," but went on to suggest that the possibility of testimony on voluntary departure being used on the issue of deportability should be avoided in future cases by following a two-stage procedure in which the issue of deportability is resolved prior to consideration of any application for voluntary departure.

Board Member Wilson was alone in dissent. She agreed that *Simmons* was not controlling and that petitioners should at least have applied for voluntary departure and testified on matters which were unrelated to the issue of alienage or deportability. However, she took exception to the Board's failure to hold that 8 C.F.R. § 242.17(d) shields testimony in support of voluntary departure, as well as the application itself, from use on the issue of deportability. She concluded that "on all the facts surrounding the case 'circumstances' have changed sufficiently to justify reopening the proceedings. . . ." J.A. 18.

§ 3.1 has always provided, in the subsection setting forth the Board's powers, that "[t]he Board shall have authority . . . to prescribe rules governing proceedings before it." *Id.* § 3.1(d)(3); *see Cisternas-Estay v. INS*, 531 F.2d 155, 158–59 n. 7 (3d Cir.), *cert. denied*, 429 U.S. 853, 97 S.Ct. 145, 50 L.Ed.2d 127 (1976). Indeed, subsequent to the Board's decision in this case, subsection (a) was itself amended, in what was described as a mere "clarification," to include express language to the effect that "[a] vacancy, or the absence or unavailability of a Board Member, shall not impair the right of the remaining members to exercise all the powers of the Board, and three members of the Board shall, at all times, constitute a quorum of the Board." *See* 40 Fed.Reg. 37207 (1975); 8 C.F.R. § 3.1(a) (1976).

■ Petitioners' second contention is that the regulation authorizing oral argument before the Board, 8 C.F.R. § 3.1(e), was rendered a nullity by the fact that four of the five participants in the Board's ultimate decision were not present at the argument. Of course, had the Board disposed of this case in anything resembling a reasonable period of time, all three of the members who were present at the 1972 hearing could have participated in the Board's decision. Neither the Board nor its appellate counsel has been able to offer any explanation whatsoever for the disgraceful delay of over three years, five months between argument and decision.[10] Nevertheless, Chairman Milhollan has submitted an affidavit to this court indicating that, pursuant to the normal practice of the Board, a transcript of oral argument was circulated along with the rest of the record to the members who decided this case, prior to the vote on the merits. This was clearly sufficient to satisfy petitioners' rights under the regulation; it is well-established "that, even without agreement of the parties, a member of an administrative agency who did not hear oral argument may nevertheless participate in the decision where he has the benefit of the record before him." *Gearhart & Otis, Inc. v. SEC*, 121 U.S.App. D.C. 186, 348 F.2d 798, 802 (1965) (footnote omitted) *and cases cited in notes 12 & 13 therein; see Massachusetts Ave. Heights Citizens Ass'n v. Embassy Corp.*, 139 U.S. App.D.C. 355, 433 F.2d 513, 515 (1970).

Finally, petitioners assert that Chairman Milhollan's participation in the decision of this case contravened the provision of the Administrative Procedure Act which mandates a separation of prosecutorial and adjudicative functions within the administrative process. APA, § 5(c), 5 U.S.C. § 554(d) (1970).[11] They observe, in support, that Milhollan was formerly employed as an attorney in the office of the INS General Counsel, and that the General Counsel had supervisory responsibility over both the trial attorney who "prosecuted" the deportation proceedings against petitioners and the appellate counsel who presented to the Board the opposition of INS to petitioners' motions to reopen proceedings.

INS's response to this argument is twofold. The Service contends, first, that even assuming the APA controls Board proceedings, Milhollan's contribution to the Board's decision was not improper since, prior to the

10. Petitioners at no time have claimed that the delay as such prejudiced their applications for voluntary departure. In fact, were it not for the outrageously slow pace of the Board's proceedings, petitioners could not have remained in this country for more than six years after their deportation orders were upheld by this court.

11. That section provides in relevant part:
An employee or agent engaged in the performance of investigative or prosecuting functions for an agency may not, on that or a factually related case, participate or advise in the decision, recommended decision, or agency review pursuant to section 557 of this title, except as witness or counsel in public proceedings.
This subsection does not apply—
(A) in determining applications for initial licenses;
(B) to proceedings involving the validity or application of rates, facilities, or practices of public utilities or carriers, or
(C) to the agency or a member of the body comprising the agency.

time he became Chairman, he had no contact with this case or any other case arising from the same set of facts. The aforesaid affidavit submitted by Milhollan on this appeal is offered to substantiate this claim.[12] Second, INS asserts that in light of the Supreme Court's holding in *Marcello v. Bonds*, 349 U.S. 302, 75 S.Ct. 757, 99 L.Ed. 1107 (1955), the APA is simply inapplicable to the Board. This proposition was recently accepted by a panel of the Third Circuit, with one judge dissenting, in the context of Board proceedings under sections 212(h), 243(h), and 245 of the Immigration and Nationality Act, *Giambanco v. INS*, 531 F.2d 141, 143–45 (3d Cir. 1976) (§§ 212(h), 245); *Cisternas-Estay v. INS, supra*, 531 F.2d at 158–59 (§ 243(h)); and the Fifth Circuit subsequently adopted the Third Circuit's reasoning in a case under § 241(a)(2) of the Act, *Ho Chung Tsao, supra* at 669.

■ We need not reach the question of whether the APA is applicable to Board proceedings, since we agree with respondent that Milhollan's affidavit establishes that no improper combination of functions took place, even measured by the relatively strict standard set forth in § 5(c) of the APA. Under § 5(c), investigative and prosecuting personnel are precluded only from participating in the adjudication of cases in which they have actually performed such functions, and in "factually related" cases. *See* note 11 *supra*. Petitioners have not alleged that Milhollan himself supervised the INS attorneys who argued against petitioners. Thus, Milhollan's sworn statement that, while he was working for the General Counsel, he "had no knowledge of or familiarity with this or any other case arising out of the same transaction," *see* note 12 *supra*, clearly places him outside the prohibition of § 5(c). *See, e. g., SEC v. R. A. Holman & Co.*, 323 F.2d 284, 116 U.S.App.D.C. 279, *cert. denied*, 375 U.S. 943, 84 S.Ct. 350, 11 L.Ed.2d 274 (1963); *R. A. Holman & Co. v.*

*SEC*, 366 F.2d 446, 451–54 (2d Cir. 1966), *cert. denied*, 389 U.S. 991, 88 S.Ct. 473, 19 L.Ed.2d 482 (1967); *Cisternas-Estay v. INS, supra*, 531 F.2d at 161 n. 4 (Gibbons, J., dissenting).

### III

Petitioners have also launched a broad attack on the merits of the Board's decision. They allege that the Board's refusal to reopen proceedings was based solely on the ground that petitioners had no "valid reason" for not applying for voluntary departure at their original hearings. This basis for decision, so it is said, violated 8 C.F.R. § 3.2 in that no consideration was given either to the fact that circumstances had changed since the original hearings, or to the fact that the Special Inquiry Officer never explained petitioners' rights to them. Moreover, petitioners assert that they did have a valid reason for not applying previously for voluntary departure: while conceding that they were given an "opportunity to apply" within the meaning of 8 C.F.R. § 3.2, they contend that exercise of that opportunity would have required them to give up their fifth amendment privilege against self-incrimination in order to obtain the statutory benefit of voluntary departure, and that *Simmons v. United States, supra*, protected them from being put to that choice.

Since it is premised on a misrepresentation of the full basis for the Board's decision, petitioners' argument that the governing regulation was not observed must fail. Chairman Milhollan's opinion for the Board stated, in no uncertain terms, the Board's conclusion that no new circumstances had arisen which warranted a reopening of the proceedings. *See* text accompanying note 9 *supra*. The regulation does not *require* the Board to grant a motion to reopen merely because some new circumstances are recit-

---

12. Milhollan's affidavit states in relevant part:

    I did not assist the Appellate Trial Attorney who argued this case before the Board, and I had no knowledge of or familiarity with this or any other case arising out of the same transaction prior to becoming Chairman of the Board. My vote was not influenced by any other member of the Board or by the fact that an attorney that I knew had argued the case.

ed; rather, the regulation *bars* reopening if relief is *not* sought on the basis of changed circumstances (and the right to apply for voluntary departure was explained and an opportunity to apply provided).

■ At most, the regulation dictates that the Board consider any new circumstances advanced in support of a motion to reopen, and that the Board not abuse its discretion in determining whether the circumstances are sufficient to justify granting of the motion. *See, e. g., La Franca v. INS*, 413 F.2d 686, 690 (2d Cir. 1969), *quoting United States ex rel. Adel v. Shaughnessy*, 183 F.2d 371, 372 (2d Cir. 1950); *Velasquez Espinosa v. INS*, 404 F.2d 544 (9th Cir. 1968). This standard is clearly met here: the Board's opinion establishes that it did pass upon the new facts cited by petitioners and, on the basis of the record before us, it is manifest that the Board did not abuse its discretion.

■ The only change in circumstances which petitioners have advanced to us as warranting reopening was the acquisition of "sixth preference" status. Inasmuch as "sixth preference" status only signifies approval of the recipient's qualifications to perform specified skilled or unskilled labor, and is only the first step in obtaining an immigrant visa, *see* note 5 *supra*, we fail to see how approval for such status materially relates to the requirements for voluntary departure—good moral character and the willingness and means to depart promptly from the United States, *see* text accompanying notes 1 & 2 *supra*. As Board Member Torrington's concurring opinion so aptly observed, *see* note 9 *supra* :

> The fact that these crewmen have, for so long, stayed in this country illegally, appear to have worked here illegally, and have managed to become beneficiaries of sixth-preference petitions, is not a ground for reopening of the proceedings to give [them] an opportunity to apply for voluntary departure.

■ With respect to petitioners' claim that 8 C.F.R. § 3.2 was violated by the Board's failure to consider that the Special Inquiry Officer did not explain petitioners' rights to them, we need only point out that Chairman Milhollan's opinion expressly noted that petitioners had not raised any such claim, *see* text following note 8 *supra*, and that petitioners' counsel explicitly declined to present the issue to the Board, *see* note 7 and accompanying text *supra*. Under these circumstances, it is obvious that petitioners have waived their rights to assert the claim in this court.

■ Petitioners' final contention—that the Board's decision improperly assumes that petitioners can be required to surrender their fifth amendment rights in order to obtain a statutory benefit—must also be rejected. As the Board recognized, *Simmons* is inapposite since that case involved forfeiture of one constitutional right (the fifth amendment privilege against self-incrimination) in order to assert another constitutional right (the fourth amendment protection against unreasonable searches and seizures). Petitioners' argument itself concedes, as it obviously must, that an opportunity for voluntary departure is not constitutionally mandated. Indeed, award of such relief is a matter which, by statute, is within the sound discretion of the Attorney General and his delegates.

■ Citing *Orloff v. Willoughby*, 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed.2d 842 (1953), respondent argues that the Attorney General is justified in exercising his discretion to deny voluntary departure where an applicant, although legitimately relying upon his privilege against self-incrimination, fails to provide the information necessary to determine eligibility for that benefit. *See also Kimm v. Rosenberg*, 363 U.S. 405, 80 S.Ct. 1139, 4 L.Ed.2d 1299 (1960); *Baxter v. Palmigiano*, 425 U.S. 308, 316–20, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976). *But see, e. g., Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967); *Spevack v. Klein*, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967). However, we need not reach this question since we have concluded, upon ex-

amination, that petitioners' reliance on the privilege against self-incrimination to justify their failure to seek voluntary departure at the original hearings is fundamentally misplaced.

First, we see no reason why petitioners could not at least have *applied* for voluntary departure at the initial proceedings. There can be no question that, under INS regulations, the applications themselves could not have been used to establish petitioners' alienage or deportability. 8 C.F.R. § 242.17(d), *quoted in text following note 2 supra.* If petitioners feared that their *testimony* would be used against them on the issue of deportability, they could have refused to testify and, if their applications were denied on that basis, they could have asserted their putative rights in the original petition for review in this court. This procedure would have fully preserved petitioners' claims, without needlessly prolonging this litigation.

More basically, petitioners have failed to explain how their testimony on the issue of voluntary departure could have incriminated them, in the sense required to support invocation of the fifth amendment privilege. It is firmly established that deportation proceedings are civil in nature, and unless a person's testimony therein might connect him with a crime, it may not be withheld on the basis of the privilege against self-incrimination. *United States ex rel. Bilokumsky v. Tod*, 263 U.S. 149,

154–57, 44 S.Ct. 54, 68 L.Ed. 221 (1923); *see Baxter v. Palmigiano, supra; id.* at 336–37, 96 S.Ct. 1551 (Brennan, J., dissenting). Petitioners allege only that their testimony might have been used against them on the issue of deportability; no claim has been made that it might have implicated them in any criminal acts.[13]

### IV

It is deplorable that the Board's slow processing of this case has allowed a motion to reopen proceedings to achieve what amounts to a six-year stay of this court's mandate affirming petitioners' deportation orders. The history of these proceedings helps to explain why the presence of large numbers of illegal aliens in this country has become a pressing national problem.

The order of the Board denying petitioners' motions to reopen proceedings is hereby

*Affirmed.*

---

**13.** Petitioners contest the Board's conclusion that none of the evidence required to support an application for voluntary departure would have been relevant to the issue of deportability. However, petitioners cite only one plausible example of evidence necessary to make a case in favor of voluntary departure, which might also be used to show deportability—testimony establishing petitioners' identities. Since alienage itself is not a crime and since petitioners have not alleged that their identities might have been used to link them to crimes which they have committed, the privilege against self-incrimination does not apply to this evidence.