PORTER & DIETSCH, INC., a corporation, William H. Fraser, Individually and as officer of said corporation, Kelly Ketting Furth, Inc., a corporation, and Joseph Furth, Individually and as officer of said corporation, and Pay'n Save Corporation, Petitioners,

v.

FEDERAL TRADE COMMISSION, Respondent.

Nos. 78–1324, 78–1497.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 9, 1979.

Decided Aug. 8, 1979.

As Amended on Denial of Rehearing and Rehearing En Banc Oct. 16, 1979.

Jerold W. Dorfman, New York City, Michael R. Rayton, Seattle, Wash., for petitioners.

William A. E. Doying, F. T. C., Washington, D. C., for respondent.

Before PELL and TONE, Circuit Judges, and KIRKLAND, District Judge.*

---

* Judge Alfred Y. Kirkland of the Northern District of Illinois sat on this case at the time of oral argument by designation. On May 1, 1979, Judge Kirkland became a senior district judge of the Northern District of Illinois and is continuing to sit on this case by redesignation.

TONE, Circuit Judge.

This case comes to us on a petition to review a Federal Trade Commission false advertising order relating to non-prescription weight reducing tablets.[1] Petitioners raise a variety of issues, which include the propriety of participation in the decision by two of the commissioners, collateral estoppel, sufficiency of the evidence, procedural due process, and the appropriateness of the relief granted. We approve the order with minor exceptions.

Petitioners are Porter & Dietsch, Inc., which packages the subject "X–11" tablets and sells them through retail drug stores and the mail; William Fraser, its president and sole shareholder; Kelly Ketting Furth, Inc., its advertising agency; Joseph Furth, the agency's account executive responsible for X–11 advertising; and Pay'n Save Corporation, a retail drug store chain that sells X–11 tablets. All petitioners except Pay'n Save took an active role in the creation of the advertisements in question and were aware that representations in them posed potential legal problems. Pay'n Save's only connection with the X–11 advertising was its participation in Porter & Dietsch's co-operative advertising programs, through which it received advertising materials and instructions for their publication from Porter & Dietsch, and caused them to be published bearing Pay'n Save's name. Nothing in the record indicates that Pay'n Save had any knowledge that the representations in the advertisements were false or unsubstantiated.

After an evidentiary hearing, an FTC Administrative Law Judge rendered an initial decision finding that petitioners had made the following representations in their advertising, as the FTC complaint had alleged:

1. Porter & Dietsch labelled and advertised the product as the "X–11 Reducing Plan," but for reasons discussed *infra* at note 4, we agree with the Commission that the advertised product was the tablets.

1) Users of X–11 tablets can lose weight without restricting their accustomed caloric intake and while they continue to eat the foods of their choice.

2) Petitioners have a reasonable basis from which to conclude that substantially all users of X–11 tablets will lose a significant amount of weight.

3) The X–11 tablet contains a unique ingredient.

In addition, the ALJ found, petitioners omitted the following material facts from their X–11 advertisements:

1) The typical and ordinary experiences of consumers do not parallel the experiences reported in testimonials appearing in the advertisements.

2) Persons with high blood pressure, heart disease, diabetes, or thyroid disease should only use X–11 tablets as directed by a physician.

3) A low-caloric diet is a part of the X–11 plan.

The ALJ found that these representations and omissions were false and misleading and constituted unfair and deceptive acts and practices in violation of §§ 5 and 12 of the Federal Trade Commission Act (15 U.S.C. §§ 45 and 52). On appeal to the Commission, the ALJ's proposed findings, conclusions, and recommended order were adopted with minor modifications.

I.

*Participation in the Decision by Commissioners Who Were Not Active Commissioners at the Time of Oral Argument.*

Petitioners' first contention is that two of the five commissioners of the FTC should not have participated in the decision. Only three commissioners were present at the oral argument before the Commission on September 29, 1976. At that time Commissioner Dole was on leave of absence because of her husband's candidacy for Vice-President of the United States, and Chairman Pertschuk was not yet a member of the Commission. Commissioner Dole resumed her duties as a commissioner and Chairman Pertschuk assumed his office many months before the case was decided.

■ Commissioner Dole remained a commissioner throughout the period of her leave. 16 C.F.R. § 3.52(f), which gives the FTC discretion to decide any case without oral argument, states:

[A] member of the Commission absent from an oral argument may participate in the consideration and decision of the appeal in any case in which the oral argument is stenographically reported.

The oral argument before the Commission in this case having been stenographically recorded, Commissioner Dole was permitted by rule to participate in the decision.

■ Petitioners argue that Chairman Pertschuk was not similarly covered by the rule, because he was not a member of the Commission at the time of oral argument. If one in his position could participate, they argue, the President could "pack" the Commission, and also it would be impossible for litigants to frame contentions "in reliance" on the existing composition of the Commission. Neither argument is persuasive. Even if we were willing to assume a President would act in bad faith, which we are not, prohibiting a commissioner appointed after oral argument from participating in the decision would not solve the problem. Nothing would prevent the Commission, after the addition of the new member, from ordering reargument or from rehearing the case after it was decided. As for the reliance argument, a litigant has no cognizable interest in the composition of the tribunal that will decide his case and is entitled only to impartiality in that tribunal. *Cf. Friedman v. Rogers,* 440 U.S. 1, 99 S.Ct. 887, 898, 59 L.Ed.2d 100 (1979).

The District of Columbia Circuit held in *Gearhart & Otis, Inc. v. SEC,* 121 U.S.App. D.C. 186, 348 F.2d 798 (1965), that participation in a decision by a member of the Securities and Exchange Commission appointed after oral argument was proper when the parties had agreed to that participation. The court then added:

The decisions of numerous courts and administrative agencies establish that,

even without agreement of the parties, a member of an administrative agency who did not hear oral argument may nevertheless participate in the decision where he has the benefit of the record before him.

121 U.S.App.D.C. at 190, 348 F.2d at 802 (footnotes omitted); *see id.* at nn.12 & 13. The court distinguished its earlier decision in *WIBC, Inc. v. FCC,* 104 U.S.App.D.C. 126, 259 F.2d 941, cert. denied sub nom. *Crosley Broadcasting Corp. v. WIBC, Inc.,* 358 U.S. 920, 79 S.Ct. 290, 3 L.Ed.2d 239 (1958), on which petitioners in the case at bar rely, on the ground, not only that there was no comparable waiver in that case, but also that the Communications Act, 75 Stat. 422, 47 U.S.C. § 409(b), requires oral argument. *See* 121 U.S.App.D.C. at 190 n.14, 348 F.2d at 802 n. 14. The FTC is not similarly restricted by statute and has a rule, 16 C.F.R. § 3.52(f), quoted above, permitting participation in the decision by a commissioner who was not present at oral argument. In *Au Yi Lau v. United States Immigration and Naturalization Service,* 181 U.S.App.D.C. 99, 105, 555 F.2d 1036, 1042 (1977), the court affirmed an agency decision even though a majority of the participating members became members of the agency after the oral argument. *Accord, Arthur Lipper Corp. v. SEC,* 547 F.2d 171, 182 n. 8 (2d Cir. 1976), cert. denied, 434 U.S. 1009, 98 S.Ct. 719, 54 L.Ed.2d 752 (1978).

The participation of Chairman Pertschuk and Commissioner Dole in the decision of the case at bar was proper.

## II.

### *Confusion of the Issues.*

Petitioners allege that they were misled to their detriment by the statements made during the hearing by the ALJ and complaint counsel concerning the relevance of whether the principal ingredient of X–11 tablets, phenylpropanolamine hydrochloride (PPA),* is an effective appetite suppressant.

■ Some confusion as to the relevance of the efficacy of PPA did exist at the hearing. The ALJ correctly stated, however, that the issue was the veracity of the representations made in the X–11 tablets advertisements, and that the efficacy of PPA was relevant only for its bearing on whether X–11 fulfilled those representations. Although petitioners contend that they were misled by the confusion and were unable effectively to cross-examine the Commission's expert witness on the efficacy of PPA, the record shows the contrary. Petitioners did cross-examine the experts on the efficacy of PPA and were not hampered in any way in their cross-examination. In addition, the record also contains numerous studies and excerpts from learned treatises on this subject. As the Commission correctly held, petitioners were not misled in the manner alleged.

## III.

### *Collateral Estoppel.*

Petitioners argue that determinations of fact made in three prior administrative proceedings preclude relitigation of the controlling issues here. The three decisions relied upon are *In re Alleghany Pharmacal Corp.,* 75 F.T.C. 990 (1969), and two Postal Service cases, consolidated for hearing before the ALJ, *In re Hanover House* and *Romar Sales Corp.,* Postal Service Docket Nos. 2/143 and 2/149 (1975). These three cases involve allegedly false and misleading advertising for a product called "Hungrex," which is said to be virtually identical to X–11.[2] The Commission rejected the collateral estoppel argument, as do we.

* After the issuance of this opinion the attention of the court was called to United States Trademark Registration No. 650,021 for "P.P.A." in International Class 5, former U.S. Class 18, filed by Alleghany Pharmacal Corporation. We used "PPA" as a convenient abbreviation without being aware of whether it had been used by others.

2. For purposes of this argument, we will assume that Hungrex and X–11 are identical products. Both are tablets containing 25 mgs. of PPA, which is the appetite suppressing ingredient that purportedly makes the product effective in weight reduction.

■ The doctrine of collateral estoppel "precludes relitigation of issues actually litigated and determined in the prior suit." *Lawlor v. National Screen Service Corp.,* 349 U.S. 322, 326, 75 S.Ct. 865, 867, 99 L.Ed. 1122 (1955); *Montana v. United States,* 440 U.S. 147, 99 S.Ct. 970, 973–974, 59 L.Ed.2d 210 (1979); *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552 (1979). The doctrine may apply even though the party asserting it was not a party in the prior case. *Parklane Hosiery Co. v. Shore, supra,* 439 U.S. at 326–33, 99 S.Ct. at 649–652; *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 334, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). It may be applied to adjudicative determinations of administrative agencies. *United States v. Utah Construction & Mining Co.,* 384 U.S. 394, 422, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966); *Bowen v. United States,* 570 F.2d 1311, 1321 (7th Cir. 1978).

*Alleghany Pharmacal* involved issues different from those in the case at bar. In the two Postal Service cases the safety issue was similar to the safety issue in the case at bar.

■ Nonetheless, the Commission was not required to give the Postal Service decisions preclusive effect. Relitigation of an issue is not precluded even between the original parties when "[t]here is a clear and convincing need for a new determination of the issue . . . because of the potential impact of the determination on the public interest or the interests of persons not themselves parties to the initial action." *Restatement (Second) of Judgments* § 68.-1(e)(i) (Tent. Draft No. 4, 1977). Comment *h* to this section of the *Restatement* gives as an example of the § 68.1(e)(i) exception an action by "an agency of government . . . for the protection . . . of a broad segment of the public." This is such a case.

This is not only a proceeding by an agency of government to protect the public from both health risks and false advertising; it deals with a body of knowledge in the fields of medical and pharmacological science that is constantly increasing. The government is not precluded from subsequently relitigating against a new respondent under these circumstances. *Cf. FTC v. Raladam Co.,* 316 U.S. 149, 150–151, 62 S.Ct. 966, 86 L.Ed. 1336 (1942) (allowing the FTC to relitigate substantially the same issue against the same party where its previous order was denied enforcement because of insufficient evidence in the record); *see Montana v. United States, supra,* 99 S.Ct. at 976–977; 2 Davis, *Administrative Law Treatise* § 18.-04 at 571 (1958).[3]

## IV.

### *Sufficiency of the Evidence.*

Petitioners assert that the findings on which the Commission based the challenged order are not supported by the evidence in the record.

■ "Whether particular advertising has a tendency to deceive or mislead is obviously an impressionistic determination more closely akin to a finding of fact than to a conclusion of law." *Beneficial Corp. v. FTC,* 542 F.2d 611, 617 (3d Cir. 1976), *cert. denied,* 430 U.S. 983, 97 S.Ct. 1679, 52 L.Ed.2d 377 (1977). Giving due regard to the FTC's expertise, *FTC v. Colgate-Palmolive Co.,* 380 U.S. 374, 385, 85 S.Ct. 1035, 13 L.Ed.2d 904 (1965), and *National Commission on Egg Nutrition v. FTC,* 570 F.2d 157, 161 (7th Cir. 1977), *cert. denied,* 439 U.S. 821, 99 S.Ct. 86, 58 L.Ed.2d 113 (1978), we must sustain the FTC's findings if they are supported by substantial evidence on the record viewed as a whole, *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 491, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

---

**3.** Petitioners also refer to a Postal Service complaint issued against Porter & Dietsch for advertisements of X–11. This complaint was dismissed without prejudice pursuant to a stipulation, Postal Service Docket No. 3/63 (January 5, 1976), and therefore can have no preclusive effect. *Lawlor v. National Screen Service Corp., supra,* 349 U.S. at 326, 75 S.Ct. 865.

Petitioners have not been the subject of government harassment in the form of repeated agency prosecutions.

■ Petitioners contend that in some instances the evidence does not support the finding that the representations were made as charged or that material facts were omitted. They also argue that no representation or omission was proved false or misleading. With respect to each representation we consider together the issues of whether it was made and whether it was false.

A. *False Affirmative Representations.*

1. *That users of X–11 tablets* [4] *can lose weight without restricting their accustomed caloric intake and while they continue to eat the foods of their choice.*

Petitioners attack this finding as inaccurate, arguing that their advertising advises the reader that the tablets function merely as an appetite suppressant which will make users "want less" and therefore "eat less." Many of the advertisements, however, proclaim in large type, "EAT WELL . . . AND LOSE THAT FAT" or "EAT WHAT YOU WANT—AND SLIM DOWN," and follow with statements that "no starvation dieting" was required and that weight could be lost without "suffering through starvation dieting hunger" or following "boring reducing diets." Other statements in the advertisements relied upon by petitioners as clarifying the matter could reasonably have been considered by the Commission to be inadequate for that purpose not only because they were buried in small print, but because in any event they did not withdraw the misleading statements. The Commission properly found that the advertisements as a whole conveyed the impression to consumers that they could lose weight through the use of X–11 without changing their eating habits and without restricting their accustomed caloric intake.

The correctness of the Commission's finding that this representation was false is supported by Porter & Dietsch's own statements in a printed insert placed in each X–11 package. The insert stated that weight loss is only accomplished when a minimum of calories are consumed and set forth an "eating program for reducing overweights" which is to be used in conjunction with the tablets. This program, which purportedly proposes "3 sensible meals a day" was characterized by expert witnesses at the hearing before the ALJ as a "starvation" or "semi-starvation" diet. The program does not allow the consumption of any rich foods or sweets or other snacks. A number of the advertisements, in contrast, assert that users can eat snacks and still lose weight. Furthermore, it is undisputed that, as the ALJ found, the tablets will not result in weight reduction unless the user follows a severely restricted caloric diet. We have no difficulty in concluding that the Commission correctly found this representation to be false.

2. *That petitioners have a reasonable basis consisting of scientific evidence from which to conclude that substantially all users of X–11 tablets will lose a significant amount of weight.*

Although the advertisements did not state in so many words that substantially all X–11 users would lose a significant amount of weight, they are replete with testimonials claiming weight losses in excess of 40, 50, and even 80 pounds attributable to use of X–11, accompanied by such statements as, "thousands of women throughout America" are losing "5, 10, 25 or even more pounds." The large weight

---

4. Petitioners contend here, as they did unsuccessfully before the Commission, that the product advertised was the "X–11 Reducing Plan." The Commission correctly found that the advertised product was the tablets, not the plan, and proceeded accordingly. The "X–11 Reducing Plan" consisted of only the tablets and a package insert which contained a proposed "eating program for overweights." This so-called program was, in the opinion of experts, a "starvation" or "near-starvation" diet. Nothing indicates that this diet would work better than any other diet X–11 users chose to follow. More important to our conclusion, the advertisements represented the product to be the tablet and did not explain what the plan entailed, beyond taking the tablets. Finally, as the Commission found, the advertisements falsely represented that dieting was unnecessary. Consequently, we too treat the product as consisting solely of the tablets.

losses are characterized as "automatic." Adding to this impression is the invariable guarantee: "RESULTS ARE GUARANTEED—OR MONEY BACK" or "TAKE WEIGHT OFF WITH THE VERY FIRST BOX OR MONEY BACK." That this claim was represented as resting on a scientific basis appears from such statements as "Recently, laboratory science has perfected a tiny tablet . . . ," "X–11 is the PROVEN and SOUND method . . . ," "clinic tested ingredients," and "medically recognized as an effective plan to lose ugly fat." The Commission properly found, based on these facts, that petitioners made what amounted to a representation that they had scientific evidence proving that substantially all X–11 users would lose a significant amount of weight.

Petitioners do not deny making this representation but challenge the finding that it was false. They argue first that "[t]here is no evidence to support the Commission's finding that 'Scientific Testing' is the only reasonable basis for substantiation of X–11 weight loss claims," and, second, that "scientific testing" supporting the claims does exist.

We need not rule on the first argument, because it is an attack on a finding the Commission did not make. While the ALJ

concluded that the efficacy of a product such as X–11 could not be substantiated without scientific evidence, the Commission did not reach the issue,[5] finding it unnecessary to do so, because, even if some other reasonable basis for the claims might have existed, petitioners had represented that the basis was scientific testing. The Commission might appropriately have reached the issue decided by the ALJ in connection with the relief granted in the order but chose instead to rely on the "fencing in" doctrine. See Part V,B,4, infra, where we consider whether the provision of the Commission's order prohibiting representations about the efficacy of the product unless they are supported by "competent scientific or medical tests or studies" is sustainable.

We have examined the evidence supporting the Commission's determination that petitioners did not have scientific evidence forming a reasonable basis for the claim that substantially all X–11 users would lose significant amounts of weight, including the findings of fact from Alleghany Pharmacal, supra. That evidence is set forth in detail in the opinion of the Commission and need not be repeated here.[6]

The scientific evidence on which petitioners rely[7] provides at most a reasonable

5. The ALJ and the Commission looked to more than "scientific testing" in attempting to find a reasonable basis; they considered scientific studies and reports, medical texts and references, the testimony of medical doctors and other experts, and even the records and findings of the "Hungrex" cases, and concluded that no reasonable basis exists for the claims made here. The Commission in In re Pfizer, Inc., 81 F.T.C. 23 (1972), recognized that "there may be some types of claims for some types of products for which the only reasonable basis, in fairness and in the expectations of consumers, would be a valid scientific or medical basis." 81 F.T.C. at 64. The case at bar, in which the representations concern the efficacy of a drug, is such a case.

6. Petitioners urge that we take judicial notice of the fact that the Food and Drug Administration Over-the-Counter Miscellaneous Internal Drugs Panel voted PPA "safe and effective" as an appetite suppressant. Even if we could consider evidence that was not before the agency, this evidence would be of no help to petitioners. The vote was taken in August of 1978,

long after petitioners made the representations in question. Moreover, the transcript of the meetings in which the FDA panel discussed the efficacy of PPA reveals that their vote would not have served as a reasonable basis for making the claims involved here even if it had come before the representations in issue were made. Although the doctors concluded that PPA is an effective appetite suppressant, they also noted that diet control is also necessary for weight reduction. Furthermore, the panel did not indicate that evidence exists from which to conclude that substantially all users of PPA will lose significant amounts of weight.

7. One study relied on by petitioners showed "clinically insignificant" differences in weight loss between a group using PPA and a group using a placebo. The closest any evidence came to establishing the effects of PPA on "all users" was a study in the Alleghany Pharmacal record which showed that 80 per cent of PPA users lost significant amounts of weight. Even this would not support a claim of success for "substantially all users."

basis for the conclusion that PPA is an effective appetite suppressant for some people, helping them to lose weight if taken in conjunction with a strict diet. But the evidence falls far short of being sufficient to establish "automatic" significant weight losses for all users, as represented.

3. *That X–11 tablets contain a unique ingredient.*

■ The frequent references in the advertisements to a "unique formula," a "unique preparation," a "special formula," coupled with statements that "laboratory science" had "recently" or "now" developed the tablets, considered in the light of the admission of Porter & Dietsch that these statements referred to PPA, support this finding.

The finding that it was false is also supported. PPA has been used for years in many products, including other over-the-counter weight reduction products. Petitioners, conceding that PPA is not unique to X–11, contend that it is a unique pharmacological substance. The ALJ found this assertion to be not wholly untrue. PPA is a particularly weak member of a family of amphetamine-like drugs.[8] It produces the same types of responses as related drugs produce, but, because it is weak, it produces fewer side effects and less central nervous system stimulation and is therefore the only drug of its class available without a prescription. Nonetheless, the ALJ and the Commission believed that the public would not understand "unique" as describing this property but would interpret it, as petitioners no doubt intended, as meaning not available in other products and unequaled in efficacy and, in view of the assertions about the recent achievement of laboratory science, newly discovered. We agree with the Commission's assessment of Porter & Dietsch's shabby hucksterism; "an other-

wise false advertisement is not rendered acceptable merely because one possible interpretation of it is not untrue." *National Commission on Egg Nutrition v. FTC, supra,* 570 F.2d at 161 n.4.

B. *Omissions of Material Facts.*

1. *The typical and ordinary experiences of consumers do not parallel the experiences reported in testimonials appearing in the advertisements.*

■ We have already approved the Commission's findings concerning the extravagant weight loss claims, which were conveyed in substantial part through the use of testimonials. *See* Part IV,A,2, *supra.* The Commission further found, based on ample evidence, that weight losses of the magnitude claimed, far from being typical, as the advertisements implied, are extremely rare in any diet regimen. Its holding that the failure to disclose that such losses are rare rendered the advertisements false and misleading is sustained.

2. *Persons with high blood pressure, heart disease, diabetes, or thyroid disease should only use X–11 tablets as directed by a physician.*

The ALJ found that the failure to include a health warning in the X–11 advertisements constituted an omission of material fact, and the Commission affirmed, with two commissioners dissenting. We approve the findings of the majority of the FTC.

Petitioners, except Pay'n Save, admit that PPA should not be ingested by persons with high blood pressure, heart disease, diabetes, or thyroid disease except under the supervision of a physician.[9] A warning to this effect is printed on the back of the X–11 package in compliance with FDA Regulations, 21 C.F.R. § 369.1, *et seq.*

---

8. The sympathomimetic amines.

9. The record shows that all sympathomimetic amines, including PPA, exert a "pressor" effect, which means they cause vascular constriction. This constriction causes an elevation of the blood pressure, which is hazardous for persons already suffering from high blood pres-

sure. The constriction also forces the heart to work harder, creating a danger for persons with heart disease. PPA also has a tendency to elevate the blood glucose level, thus aggravating diabetes in persons suffering from that disease. PPA apparently also exacerbates the effects of an overactive thyroid.

The erroneous impression that X–11 is safe for use by all potential consumers is created by the statement, "No dangerous drugs," the effect of which is aggravated by the statement, "Laboratory science has perfected a tiny pre-meal tablet . . . ." Petitioners sold large quantities of X–11 tablets to mail order purchasers, who would not have an opportunity to read the health warning on the package until they had already paid out their money and some of whom, having paid, would be likely to take the risk inherent in using the tablets.

The record shows that many people suffer from the diseases PPA tends to aggravate and that many of those people are overweight. An estimated 28,410,000 persons in the United States suffered from a heart ailment or high blood pressure in 1972. Of these, 22,950,000, one out of every six adults, had high blood pressure. One out of every 20 suffered from diabetes in 1975. Furthermore, high blood pressure and heart disease occur more frequently among the overweight, and the likelihood of being diabetic more than doubles with every 20 per cent of excess weight. Thus the product and the advertising are designed for persons most likely to suffer from the serious side effects.

The finding that the failure to disclose health risks rendered the ads false and misleading is sustained.[10]

**3. *A highly restricted caloric diet is a part of the X–11 plan.***

The findings we affirmed in Part IV,A,1, *supra,* also support the Commission's finding that this omission caused the advertisements to be false and misleading.

## V.

### *Propriety of the Remedy.*

**A. *Standard of Review.***

■ The Supreme Court set forth the standard for reviewing remedial provisions

of an FTC order in *Jacob Siegel Co. v. FTC,* 327 U.S. 608, 612–613, 66 S.Ct. 758, 760, 90 L.Ed. 888 (1946):

> The Commission is the expert body to determine what remedy is necessary to eliminate the unfair or deceptive trade practices which have been disclosed. It has wide latitude for judgment and the courts will not interfere except where the remedy selected has no reasonable relation to the unlawful practices found to exist.

**B. *Portions of the Order Applicable to Petitioners Porter & Dietsch and William Fraser.***

**1. *The First Amendment.*[11]**

■ Petitioners contend that the order violates their rights under the First Amendment, which protects "commercial speech." *Bigelow v. Virginia,* 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975). They concede, however, as they must, that the First Amendment allows the prohibition of false and misleading advertising. *Ohralik v. Ohio State Bar Association,* 436 U.S. 447, 455–456, 98 S.Ct. 1912 (1978); *Bates v. State Bar of Arizona,* 433 U.S. 350, 381–384, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977); *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 771–772, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976); *National Commission on Egg Nutrition v. FTC, supra,* 570 F.2d at 161–162. Because the advertising material subject to the Commission's order was false and misleading, *see* Part IV, *supra,* it receives no protection from the First Amendment.

**2. *Product coverage.***

■ Paragraph I of the order restricts the representations Porter & Dietsch and Fraser may make concerning any "food,"

---

**10.** Petitioners again point to the *ex post facto* FDA panel vote that PPA is "safe and effective." *See* note 6, *supra.* The doctors on the panel agreed, however, that because of its potential for adverse reaction, PPA has been contraindicated for persons with high blood pressure, heart disease, diabetes, and thyroid disease.

**11.** Petitioners' assertion that the affirmative disclosures required by Paragraph I,E of the order violate the First Amendment are treated separately in Part V,B,7, *infra.*

"drug," "cosmetic," or "device" as these terms are defined in the Federal Trade Commission Act. Petitioners contend that this breadth of product coverage makes the order overly broad, because there is no rational connection between the Commission's findings and restrictions placed on representations of products other than X–11. The record shows that Porter & Dietsch is continuously testing and marketing new products and, as a wholesale operation not faced with the expense of modifying manufacturing facilities to add new products to its line, it can do so comparatively cheaply. Fraser and wholly-owned subsidiaries of Porter & Dietsch have violated the Federal Trade Commission Act in the past.[12] These facts and the evidence of petitioners' readiness, in carrying out the advertising campaign for X–11, to go at least to the very limits of what the law might be argued, with some modicum of plausibility, to allow, justified the breadth of the order against the principal offenders.

### 3. *Paragraph I,A.*

■ Paragraph I,A of the order prohibits representations that a user of a product can lose weight without restricting caloric intake and while eating the foods of his or her choice. Petitioners contend that Paragraph I,A is not supported by substantial evidence, because it is premised on the assumption that a user of X–11 must consciously restrict caloric intake and consciously avoid foods of his or her choice to lose weight. That assumption is false, they argue, because PPA is an effective appetite suppressant which unconsciously and automatically reduces food intake. Petitioners' position is untenable in light of the findings upheld in Part IV,A,1, *supra*, of this opinion. X–11 must be coupled with a conscious adherence to a restricted calorie diet to be effective and Paragraph I,A merely prohibits petitioners from making representations

to the contrary. Paragraph I,A is reasonably related to the unlawful practice and is valid.

### 4. *Paragraph I,B.*

■ Paragraph I,B prohibits representations that a user of a product "can achieve any result" unless the representation is, when made, substantiated by competent scientific or medical tests and studies and requires that such tests or studies, the raw data gathered, and the procedures followed, be available to the Commission for inspection for three years following the representation. Petitioners contend that Paragraph I,B improperly relieves the Commission of the burden of proving their advertising representations false and imposes on petitioners the burden of proving the truthfulness of any claims they make. The Commission defends Paragraph I,B as a "fencing in" provision justified by the petitioners' false representation that they had scientific evidence which formed a reasonable basis from which to conclude that substantially all X–11 users would lose significant amounts of weight.

Petitioners rely on *Federated Nationwide Wholesalers Service v. FTC*, 398 F.2d 253 (2d Cir. 1968), for the proposition that "in no event is the Commission warranted in decreeing what in effect is clearly a shifting of the burden of proof from itself to the petitioners." 398 F.2d at 260. There the challenged order prohibited the petitioners from representing themselves as wholesalers, but provided that " 'it shall be a defense in any enforcement proceeding under this order for [petitioners] to show' " that they actually operated as wholesalers, 398 F.2d at 259. The court modified the order to prohibit petitioners from representing that they are wholesalers "unless they in fact" operate as wholesalers. 398 F.2d at 260. Paragraph I,B of the order before us resembles the modified order in *Federated*

---

12. *See In re Udga, Inc. and William Fraser, and Mary Fraser*, 24 F.T.C. 1245 (1937), wherein the FTC found that an antacid was being deceptively advertised as a cure for ulcers. Fraser is also subject to an FTC consent order, *In re Ru-Ex, Inc.*, 59 F.T.C. 839 (1961), which is limited to products similar to the one sold there as a remedy for arthritis or rheumatism. The Commission considered this consent order in mitigation, rather than in aggravation, on the point of the necessity of a broad order.

*Nationwide* more closely than the objectionable order in that case. Essentially, Paragraph I,B prohibits petitioners from making representations unless they are true; it does not make the truthfulness of the representation an affirmative defense petitioners must prove once the Commission establishes that petitioners have made representations. The burden of proof remains entirely on the Commission.

The authority of the Commission to impose "fencing in" restrictions is stated in *FTC v. Colgate-Palmolive Co., supra,* 380 U.S. at 395, 85 S.Ct. at 1048:

> We think it reasonable for the Commission to frame its order broadly enough to prevent respondents from engaging in similarly illegal practices in future advertisements. As was said in *Federal Trade Comm'n v. Ruberoid Co.,* 343 U.S. 470, 473 [72 S.Ct. 800, 803, 96 L.Ed. 1081]: "[T]he Commission is not limited to prohibiting the illegal practice in the precise form in which it is found to have existed in the past." Having been caught violating the Act, respondents "must expect some fencing in." *Federal Trade Comm'n v. National Lead Co.,* 352 U.S. 419, 431 [, 77 S.Ct. 502, 1 L.Ed.2d 438].

Although Paragraph I,B is as extreme a fencing in provision as we would sustain, we think it is justified in this case by the egregiousness of past misrepresentations and the propensity of the principal respondents to violate the Act.[13]

### 5. *Paragraph I,C.*

Paragraph I,C prohibits representing that any testimonial for a product "represents the typical or ordinary experience of members of the public who use the product unless this is the case." As we held in Part IV,B,1, *supra,* the advertisements did falsely and deceptively represent that the testimonials were indicative of the typical experience of X–11 users. This is a sufficient basis for Paragraph I,C.

Petitioners argue that the words "unless this is the case" shift the burden of proof but we think they do not. As we said of the words "unless they establish" in *Western Radio Corp. v. FTC,* 339 F.2d 937, 940 (7th Cir. 1964), *cert. denied,* 381 U.S. 938, 85 S.Ct. 1770, 14 L.Ed.2d 701 (1965), "[w]e take this to mean no more than that petitioners must not speak falsely in advertising . . . ." Paragraph I,C is reasonably related to the unlawful practices and valid as issued.

### 6. *Paragraph I,D.*

Paragraph I,D prohibits representations that a product contains "one or more unique ingredients or components, unless respondents can establish that any such ingredients or components are unavailable in products sold by others." Petitioners contend that Paragraph I,D is arbitrary in establishing only one definition for the word "unique." In Part IV,A,3, *supra,* we sustained the FTC's finding that "unique," in the context in which it was used, falsely represented to consumers that none of petitioners' competitors used PPA. This is a sufficient basis for Paragraph I,D.

Petitioners also argue that the words "unless [petitioners] can establish" improperly shifts the burden of proof, but *Western Radio* again controls. Paragraph I,D is reasonably related to the unlawful practices and is valid as issued.

### 7. *Paragraph I,E.*

Paragraph I,E requires petitioners to include in all advertisements the statements "DIETING IS REQUIRED" and "WARNING: THIS PRODUCT POSES A SERIOUS HEALTH RISK FOR SOME USERS. READ THE LABEL CAREFULLY BEFORE USING." Petitioners urge us to vacate this much of the order because it is unsupported by substantial evidence, creates an inconsistency in the treatment given to different persons engaged in the same

---

**13.** Petitioners also assert the efficacy of methylcellulose, another ingredient of X–11, or the combination of PPA and methylcellulose, but petitioners have waived their right to appeal the ALJ's findings as to methylcellulose by not appealing them to the Commission. *See In re Porter & Dietsch,* FTC Docket No. 9047, Dec. 20, 1977, at 15 n.17.

conduct, and violates the First Amendment.[14]

■ Substantial evidence in the record as a whole supports the underlying findings on which these affirmative disclosures are based. In Part IV,A,1 and B,3, *supra*, we affirmed the Commission's findings concerning the necessity of a low calorie diet regimen,[15] and the health risk caused by PPA.

Petitioners' inconsistent treatment argument is premised upon the fact that the Commission did not impose a "DIETING IS REQUIRED" disclosure requirement on the manufacturer in *Carlay Co. v. FTC*, 153 F.2d 493 (7th Cir. 1946), and the Commission did not require the inclusion of either disclosure in *Alleghany Pharmacal, supra*. The *Carlay* case involved an entirely different product, which did not include PPA, and consequently comparison is not justified. In *Alleghany Pharmacal*, which did involve the same product, the advertisement quoted in the Commission's opinion made no representations concerning weight loss without dieting, the Commission found the advertisements contained no representations concerning safety, and the complaint apparently did not allege the failure to include the warning as an omission of material fact. In any event, when the safety of consumers is involved, as it is here, we would not preclude the Commission from imposing such a sanction simply because it failed to do so years before in another case.[16]

The fact that other firms in the market are not similarly burdened does not affect the validity of this order. " 'The purpose of Commission orders is not to put those employing deceptive acts or practices *in pari delicto* with each other.' " *Spiegel, Inc. v. FTC*, 494 F.2d 59, 64 (7th Cir.), *cert. denied*, 419 U.S. 896, 95 S.Ct. 175, 42 L.Ed.2d 140 (1974) (quoting *Collier & Son Corp. v. FTC*, 427 F.2d 261, 276 (6th Cir. 1970)).[17]

■ The First Amendment permits the imposition of disclosure requirements in appropriate cases. *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, supra*, 425 U.S. at 771–772 n.24, 96 S.Ct. 1817; *Warner-Lambert Co. v. FTC, supra*, 183 U.S.App.D.C. at 239–240, 562 F.2d at 758–759. We described the limitations placed on the scope of the authority to require disclosure in *National Commission on Egg Nutrition v. FTC, supra*, 570 F.2d at 164:

> The First Amendment does not permit a remedy broader than that necessary to prevent deception, . . . or to correct the effects of past deception.

■ The "DIETING IS REQUIRED" disclosure is necessary to prevent deception. The record shows the X–11 tablets do not cause weight loss in the absence of a restricted calorie diet regimen. An advertisement that does not disclose this is deceptive. We therefore uphold the requirement that the phrase "DIETING IS REQUIRED" be included in future advertisements.

---

14. Petitioners do not appear to dispute the existence of FTC authority to require such disclosures. In *Warner-Lambert Co. v. FTC*, 183 U.S.App.D.C. 230, 237–243, 562 F.2d 749, 756–762 (D.C.Cir.1977), *cert. denied*, 435 U.S. 950, 98 S.Ct. 1575, 55 L.Ed.2d 800 (1978), the court performed a detailed analysis and concluded that the Commission possessed the power to order "corrective advertising." We reached the same result in *National Commission on Egg Nutrition v. FTC, supra*, 570 F.2d at 164.

15. Additionally, the record contained a letter from petitioner Furth to petitioner Fraser, in which Furth wrote "Appedrine and Hungrex (even Odrinex) put emphasis on the tablets. That's murder, because the pills will not reduce weight one iota. It is the 'Plan' that will keep us out of hot water." As we have noted earlier, see note 4, *supra*, the "Plan" is no more than a suggested diet.

16. *See* Part III, *supra*.

17. Petitioners rely on *Marco Sales Co. v. FTC*, 453 F.2d 1 (2d Cir. 1971), as support for the proposition that the inconsistent treatment requires us to vacate the order. *Marco Sales Co.*, however, is distinguishable from the case at bar. There the Commission issued an order against a manufacturer which was wholly inconsistent with an almost contemporaneously issued Trade Regulation Rule without even adverting to the new regulation, much less explaining why it refused to adhere to that regulation. Agency adjudications do not create industry-wide standards as rulemaking does.

Unnecessarily broad, however, is the requirement that the advertising by Porter & Dietsch and Fraser of any product contain the words "WARNING: THIS PRODUCT POSES A SERIOUS HEALTH RISK FOR SOME USERS. READ THE LABEL CAREFULLY BEFORE USING." The Commission itself recognizes in its brief that this warning should not be required for products that do not contain PPA or similar compounds, because PPA is the only ingredient in X–11 shown by the record to cause a health risk. Yet the order is not so limited.

Moreover, the quoted words are not sufficiently specific even as to products to which they may appropriately be applied. So far as the evidence shows, PPA is dangerous only to users who suffer from certain ailments.

The order is modified by making the warning requirement applicable only to products that contain PPA or similar compounds and changing it to read, "WARNING: THIS PRODUCT POSES A SERIOUS HEALTH RISK FOR USERS WITH HIGH BLOOD PRESSURE, HEART DISEASE, DIABETES, OR THYROID DISEASE. READ THE LABEL CAREFULLY BEFORE USING."

C. *Portions of the Order Applicable to Petitioners Kelly Ketting Furth and Joseph Furth.*

As we understand the position of the Furth petitioners, they join in the objections of Porter & Dietsch and William Fraser to Paragraph I, but make no arguments concerning the propriety of Paragraph II of the order, which requires them to cease and desist from disseminating advertisements for diet remedy or weight reduction products that in any way violate Paragraph I of the order. Petitioners have thus waived any objection to Paragraph II.[18] Fed.R. App.P. 28. Insofar as it applies to the Furth petitioners Paragraph II is valid as issued.

## VI.

A. *Pay'n Save's Liability.*

Petitioner Pay'n Save asserts that it should have been neither prosecuted nor found liable. It contends that no possible public interest is served by prosecuting a retailer who had no part in the creation of the advertisements. Section 5(b) vests the Commission, not the court, with broad discretion in determining what constitutes the public interest. *FTC v. Rhodes Pharmacal Co.*, 191 F.2d 744, 747 (7th Cir. 1951). As we have stated,

> [W]e have no authority to determine what is in the public interest, except negatively in the sense of insuring the Commission does not attempt to use its powers to vindicate private rights, and possibly in the case of *de minimis* activity.

*Montgomery Ward & Co. v. FTC*, 379 F.2d 666, 672 (7th Cir. 1967). The Commission has not sought to vindicate private rights here, and Pay'n Save's activity cannot be characterized as *de minimis.* Consequently Pay'n Save's public interest argument is without merit.

Pay'n Save also argues that it should not have been held liable for its use of advertisements prepared by the others in the absence of any knowledge of falsity. Nothing in the record indicates that Pay'n Save actually had knowledge of falsity. As to whether Pay'n Save should have known of the misrepresentations, the Commission concluded that "[i]f Pay'n Save had critically examined the advertising in light of the package insert, it should have been obvious that the advertising at least did not coincide with the plan." While this conclusion is undoubtedly correct, we need not rely on it in our discussion of liability because § 12[19]

---

18. Given the level of involvement of these petitioners indicated by the record, *see, e. g.,* note 15, *supra*, any such objections undoubtedly would have proven fruitless. *See, e. g., Carter Products, Inc. v. FTC*, 323 F.2d 523, 533–534 (5th Cir. 1963).

19. The Commission held Pay'n Save liable for a violation of § 12, and, through § 12(b), of § 5. Pay'n Save was not held liable under § 5 directly, so we are concerned only with liability under § 12.

imposes a strict liability standard on disseminators of false advertising.

Section 12(a) states in relevant part:

It shall be unlawful for any person, partnership, or corporation to disseminate, or cause to be disseminated, any false advertisement . . . .

The statute does not make mental state an element of violation and creates no exemption from liability for parties not involved in the creation of the false advertising or for unwitting disseminators of false advertising. When Congress intended to make such an exemption it did so expressly. Section 14(a) makes certain violations of § 12 misdemeanors, but § 14(b) creates an exemption from criminal liability for advertising agencies and media under certain circumstances. 15 U.S.C. § 54. Under these circumstances the omission of any exemption from § 12 indicates that Congress did not intend one.

Pay'n Save relies on a series of decisions which it says indicates that the liability of an advertising agency may depend upon the extent of its participation in the deception, which in turn depends upon a knowledge of the falsity of the advertisements. *Colgate-Palmolive Co. v. FTC*, 310 F.2d 89, 92 (1st Cir. 1962); *Carter Products, Inc. v. FTC*, 323 F.2d 523, 533–534 (5th Cir. 1963); *Doherty, Clifford, Steers & Shenfield, Inc. v. FTC*, 392 F.2d 921, 927–929 (6th Cir. 1968). The Commission has, on occasion at least, exercised its enforcement discretion to dismiss complaints against advertising agencies that were merely acting under the direction and control of the advertiser. *See In re Bristol Myers Co.*, 46 F.T.C. 162, 176 (1949). Noting that this was a matter of administrative discretion, the First Circuit in the *Colgate-Palmolive* case enforced an order based on a finding that the agency was an "active . . . mover" in the deception, 310 F.2d at 92, but did not intimate that the FTC could not hold liable an agency that did not have knowledge of the deception. *Carter Products* is similar. There the Fifth Circuit enforced an order against an advertising agent that had "actually participated in the deception." 323

F.2d at 533–534. In *Doherty, Clifford* the Sixth Circuit did say that knowing participation in the deception was necessary but found it to exist. 392 F.2d at 928, 929. Thus in each of these cases the advertising agency knew of the falsity, and the court sustained liability. In none of them was the court required to decide whether the agency was liable in the absence of knowledge.

The court in *Doherty, Clifford* recognized that "[t]he fact that an advertiser made its representations in good or bad faith is not determinative of whether such statements are deceptive and misleading." 392 F.2d at 925. It is settled that the advertiser's intent to deceive is not an element of the violation. *E. g., Chrysler Corp. v. FTC*, 182 U.S.App.D.C. 359, 365 n.5, 561 F.2d 357, 363 n.5 (1977); *Montgomery Ward & Co. v. FTC, supra*, 379 F.2d at 670. We find no basis in the language of § 12 for not applying these principles to an advertiser who is a retailer.

**B.  *The Propriety of the Remedy as to Pay'n Save.***

The extent of a party's culpability has an important bearing, however, on the nature of the relief that should be granted. Paragraph II of the Commission's order subjects both Pay'n Save and the Furth defendants, who did knowingly participate in the deception, to the same broad relief with respect to all diet remedies. They are prohibited from disseminating "any advertising which contains a representation or testimonial for such product prohibited by Paragraph I of the Order [which applies to Porter & Dietsch and Fraser], or which omits a disclosure for such product required by Paragraph I of this Order." We think the fact of Pay'n Save's uncritical participation in the X–11 co-operative advertising program is not sufficient to support an inference that there is a substantial danger that Pay'n Save's future advertising of diet remedies not manufactured or distributed by Porter & Dietsch will be deceptive. No need has been shown for "fencing in" Pay'n Save. This paragraph of the order, therefore, goes too far with respect to Pay'n

Save and is modified to provide that, as to Pay'n Save, it applies only to advertising of Porter & Dietsch products.

ENFORCED AS MODIFIED.